James W. VIRDIN, Defendant
Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

No. 593, 1999.

Supreme Court of Delaware.

Submitted: July 19, 2001.
Decided: Sept. 12, 2001.

James E. Liguori, Esquire (argued) and Laura A. Redding, Esquire of Liguori, Morris & Redding, Dover, Delaware, Attorneys for Appellant.

John Williams, Esquire, Department of Justice, Dover, Delaware, Attorney for Appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices, constituting the Court en Banc.

VEASEY, Chief Justice:

This appeal of a life sentence without probation or parole entered on a first degree murder conviction presents several issues, two of which are of particular importance in our jurisprudence.

One issue is the question of when a search by private parties becomes a police search, thus invoking the constitutional protections against unreasonable searches and seizures by state agents. In this case we agree with the trial court's determination that the search was primarily instigated and conducted by the victim's mother (albeit with police assisting) of her missing daughter who was nine-months pregnant. Thus, it was a private search by a concerned parent looking for her missing daughter, not a search where the mother was an agent of the State.

On the second issue, we hold that the failure of the trial court to give instructions on the lesser included offenses of manslaughter and criminally negligent homicide was not reversible error. Here, the jury was instructed on both first degree and second degree murder. The jury opted for a first degree murder conviction, thus rejecting the second degree option. This renders moot or harmless the failure of the trial judge to instruct on other offenses that were of a lesser severity than second degree murder, even assuming (without deciding) that there was a ration-

al basis in this record for those lesser included offenses.

We find that the additional assignments of error are·without merit. Accordingly, we affirm the judgment of the Superior Court.

### *Facts*

The victim in this case is Stefanie Virdin, who was the wife of James W. Virdin at the time of Stephanie's murder for which Virdin was ultimately convicted and sentenced.[1] In September 1999 Stefanie was carrying a full-term fetus and was due to give birth on Monday, September 21. Early that Monday morning, Stefanie's mother, Tina Yun, was alarmed because she had not seen or spoken with her daughter since Saturday afternoon.[2] Mrs. Yun had spent all day Sunday trying to locate her daughter. She testified (hyperbolically) that she had called the Virdin's apartment "30,000 times from Sunday morning until [Sunday night.]" Also, she said she "was out riding the roads looking at all hospitals. I called Beebe hospital. I called Christian hospital. I called Kent General Hospital. I rode through Kent General Hospital parking lot about three or four times." Therefore, when she woke up early on Monday morning, she decided to drive over to the Virdins' apartment to look for Stefanie. Arriving at approximately 8 a.m., Mrs. Yun entered through the front door using keys that Stefanie had given her.[3]

Inside the apartment, Mrs. Yun encountered Virdin but not Stefanie. She asked Virdin where Stefanie was, saying, as she recalled in her testimony, "Where is Stefanie? I've been calling 30,000 times from Sunday morning [and] I had no answer." Virdin told Mrs. Yun that Stefanie had spent the night with certain relatives. Mrs. Yun left the apartment. Using her car phone, she learned that Stefanie had not, in fact, spent the night with these relatives and that they did not know where Stefanie was. She made calls to other relatives but none of them had seen Stefanie.

Mrs. Yun decided that she wanted to go back to the apartment, but that she wanted the police to accompany her because she was frightened. She drove to a police station, arriving there at approximately 9:00 a.m. At first, it appeared that no officers were immediately available, but Mrs. Yun testified that she "was pretty pushy about getting an officer to go with me," telling an officer on duty, Sergeant Timmons, "It can't wait." She testified that she was "visibly upset" and "crying." Sergeant Timmons agreed to accompany her to the Virdins' apartment, following her there in his police car.[4] On the drive over, she left a message on Virdin's machine warning him that she was arriving

---

1. The jury found by a vote of 11 to 1 that the mitigating circumstances found to exist outweighed the aggravating circumstances. *See* 11 *Del. C.* § 4209(c)(3). The trial judge sentenced Virdin to life imprisonment without the benefit of probation, parole or other reduction.

2. The Superior Court found that Mrs. Yun and Stefanie had a "close relationship" and "constantly communicated and prepared for the due date of September 21, 1998, and the care of the baby after the birth."

3. Stefanie had given Mrs. Yun the keys about a month earlier so that once Stefanie had given birth, Mrs. Yun could enter by herself without Stefanie having to walk down a flight of stairs to let her in. Mrs. Yun had not used the keys before this occasion.

4. Sergeant Timmons testified that he accompanied Mrs. Yun in order to "keep the peace." At the station, Mrs. Yun told Timmons that "she felt James was getting high" and that "he wasn't answering her, wouldn't look at her [and] just made her feel uneasy."

with a police officer and that he should dispose of any drugs he was keeping.

Mrs. Yun and Sergeant Timmons arrived at the apartment and entered using Mrs. Yun's keys. Virdin was not there. They each proceeded to check through different areas of the apartment. Timmons came upon the bedroom door, finding it locked. Through the locked door Timmons could hear the air conditioner running inside the bedroom. With Mrs. Yun standing behind him, he jimmied open the door with a penknife, and took a quick look inside the bedroom to verify that no one was there. Seeing nothing amiss, he left the bedroom, leaving the door unlocked. According to Timmons, the whole apartment was very neat and clean. This search took about ten minutes, after which Timmons and Mrs. Yun left the apartment—Timmons leaving his business card on a coffee table with a written request to Virdin to call him immediately.

Later in the afternoon, Sergeant Timmons learned that a Dodge pickup truck recently traded in by Virdin had been stolen from the lot of a car dealership. At approximately 3:30 p.m., he put out a general bulletin to be on the lookout for the stolen truck and for Virdin as a suspect in the theft. Timmons also broadcast the tag number of Virdin's Dodge Durango (a separate car the existence of which he had learned of through Mrs. Yun) in an attempt to locate the Durango and Stefanie. Throughout the day, Timmons made additional stops at the apartment to knock on the door. Using phone numbers given to him by Mrs. Yun, he also called various family members and left messages on the Virdins' answering machine. As the afternoon wore on, concern grew over Stefanie's absence. Timmons briefed others in the department on the situation. A missing person report was filed at approximately 5:30 on Monday evening.

In a phone conversation at some point in the afternoon, Mrs. Yun told Timmons that she and her husband, Mike Yun, wanted to check the apartment again. Timmons advised her that before returning she should contact Corporal Graham, who was scheduled to relieve Timmons, so that Graham could accompany the Yuns to the apartment in order to avoid any "problems." Timmons thus informed Graham that the Yuns "may stop by the department to have an officer respond to Mrs. Virdin's apartment," and briefed Graham on the general situation, including Timmons' own efforts throughout the day. When the Yuns called the station to state that they wished to return to the apartment, Graham arranged to meet them there.

At approximately 8:00 on Monday evening, Corporal Graham and the Yuns entered the apartment, using, as before, Mrs. Yun's key. The Yuns and Corporal Graham each looked in various rooms of the apartment. Again, everything was neat and apparently in order. Reaching the bedroom door, Graham saw that it was locked,[5] and informed the Yuns that he could not open it. Mike Yun jimmied the door open with Corporal Graham standing behind him. The Yuns entered the room and walked to the right side of the bed. Mike Yun smelled a "terrible stench" as he entered the room. Corporal Graham walked into the bedroom and proceeded to check a closet on the left side of the bed. Stefanie's body was lying on the ground on the right side of the bed, partially obscured by pillows. Tina Yun saw the body and screamed. Corporal Graham took the Yuns out of the bedroom, and then returned inside. Looking at the body, he

---

**5.** Virdin had returned to the apartment in the afternoon and relocked the bedroom door that Timmons had jimmied open earlier that day.

had "no doubt" that Stefanie was dead. Virdin became a suspect in his wife's homicide.

About an hour later, the police found Virdin driving the stolen truck. Virdin was brought to the Dover Police Department. Virdin waived his *Miranda* rights and gave an audiotaped and videotaped interview in which he confessed to the murder.[6]

According to Virdin, on Saturday morning he and Stefanie were in the bedroom arguing about Virdin's drug habit and the money it consumed. There was some pushing and shoving between the two of them. Virdin "lost all control" and the two of them ended up on the floor beside the bed. Virdin sat on Stefanie (apparently with his knees on her), who was lying on her back, and choked her to death.[7] Virdin then covered her up with pillows and left the apartment in search of drugs. Virdin also confessed to having stolen the pickup truck using a spare key he had retained. Search warrants for the apartment and both of Virdin's vehicles were obtained and executed in the early morning hours of September 22, 1998.

Virdin raises four issues on appeal. He contends that: (1) the Superior Court erred by denying his motion to suppress evidence obtained as a result of a search he claims was illegal; (2) the Superior Court abused its discretion by finding that Virdin's waiver of his *Miranda* rights was voluntary, consequently denying his mo-

tion to suppress his statement to the police; (3) the Superior Court erred by denying his request for a jury instruction on the lesser included offenses of manslaughter and criminal negligence; and (4) the Superior Court abused its discretion by admitting into evidence a photograph and certain diagrams depicting, respectively, the pregnant victim's naked corpse and the size and position of a full-term fetus.

### Search Issue

Virdin moved to suppress the evidence of the body itself and other evidence obtained as a result of the search of the apartment, contending that the police searched his home without a warrant and without any alternative justification for a warrantless search under the Federal or Delaware Constitutions.[8] The trial court denied the motion, relying on the principle that state and federal constitutional guarantees against unreasonable searches apply only to searches conducted by the State. The trial court found that in this case the search was a private search conducted by the Yuns, who would have searched the apartment whether the police were present or not. Therefore, the trial court found that the discovery of Stefanie's body by the Yuns was not imputable to the police. Virdin argues that (1) the Yuns were state agents because their search was part of an ongoing investigation; and (2) in any event the active role played by Tim-

---

**6.** The video tape was played for the jury at trial. Virdin did not testify. Virdin's statement is the only direct account of the murder.

**7.** Graham testified that he saw a "red mark around" Stefanie's neck. An expert for the State testified at trial that the cause of death was asphyxiation and that Stefanie's pregnancy contributed to her death because the fetus puts pressure on the inferior vena cava, lowering blood circulation as well as the amount of oxygen that is in the blood. The expert

explained that it "takes actually more work for a pregnant woman, especially one who is near term, to take a breath than one who is not pregnant...."

**8.** The primary evidence Virdin moved to suppress is the victim's body. Virdin also contends that other evidence should have been suppressed, including his statement to the police and evidence seized from his automobiles.

mons and Graham exceeded the bounds of any initially private search.

■ The Superior Court's denial of a pretrial motion to suppress after an evidentiary hearing is reviewed on appeal for an abuse of discretion.[9] The formulation and application of legal concepts to undisputed facts is reviewed de novo.[10] "To the extent the trial court's legal decision is based on its own factual findings, it is reviewable to determine whether there was sufficient evidence to support the findings, and to determine whether those findings were the result of a logical and orderly deductive process."[11]

■ A search or seizure conducted by a private party does not implicate the Fourth Amendment.[12] Evidence discovered as a result of such a search is not subject to the exclusionary rule, which is aimed at deterring "official misconduct."[13] When a private party conducts a search as an "instrument or agent" of the government, however, the Fourth Amendment[14] and Article 1, § 6 of the Delaware Constitution apply. "The government may not do, through a private individual, that which it is otherwise forbidden to do."[15] In addition, apart from the agency analysis, the level of police participation in an initially private search may transform that search into a governmental search, raising a separate issue focusing on actions of the police rather than the Yuns.[16]

■ We now address the issue whether the searches in this case were private searches. First, we address whether the Yuns were state agents. We find that the following legal framework is helpful:

> [T]wo critical factors in the instrument or agent analysis are whether the government knew of and acquiesced in the intrusive conduct and whether the private party's purpose in conducting the search was to assist law enforcement agents or to further [its] own ends. Other useful criteria are whether the private actor acted at the request of the government and whether the government offered the private actor a re-

9. *See Seward v. State,* Del.Supr., 723 A.2d 365, 370 (1999).

10. *See Jones v. State,* Del.Supr., 745 A.2d 856, 860 (1999).

11. *Downs v. State,* Del.Supr., 570 A.2d 1142, 1144 (1990).

12. *See Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 2401, 65 L.Ed.2d 410 (1980) (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 2048–2050, 29 L.Ed.2d 564 (1971)); *United States v. Shahid,* 7th Cir., 117 F.3d 322, 325 (1997) (citations omitted); *United States v. Kinney,* 4th Cir., 953 F.2d 863, 865–66 (1992). This analysis applies to the Delaware Constitution as well.

13. *Coolidge,* 91 S.Ct. at 2049; *see Rickards v. State,* Del.Supr., 77 A.2d 199, 204 (1950) (adopting the exclusionary rule because "[t]he most effective way to protect the guarantees against unreasonable search and seizure and compulsory self-incrimnation is to exclude from evidence any matter obtained by a violation of them").

14. *Id.; Shahid,* 117 F.3d at 325.

15. *United States v. Feffer,* 7th Cir., 831 F.2d 734, 737 (1987).

16. *Cf. United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 1657, 80 L.Ed.2d 85 (1984) ("The additional invasions of respondents' privacy by the government agent must be tested by the degree to which they exceeded the scope of the private search.") (citing *Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 2402, 65 L.Ed.2d 410 (1980)); *Kinney,* 953 F.2d at 865 (rejecting argument that "the presence of the police transformed the nature of the search from a private search to a governmental search" and that the officers' participation "exceeded the scope of the initial private search").

ward.[17]

The analysis is a highly factual one that must take into account the totality of the circumstances.[18] The defendant bears the burden of proving that the private party was acting as an instrument or agent of the government.[19]

We conclude that the trial court's determination that the Yuns were not acting as state agents finds substantial support in the record. The Superior Court found that "Mrs. Yun had a driving maternal motivation independent of any governmental action to find her missing daughter who was due to deliver a baby on Sept. 21, 1998." [20]

Mrs. Yun was understandably alarmed at her daughter's unexplained absence on the days before she was to give birth. In the two days leading up the discovery of the body, she engaged in frantic efforts to locate her daughter, including driving to area hospitals, calling various people who might have seen Stefanie, and visiting the apartment by herself early on Monday morning. Her decision to go back to the apartment with Sergeant Timmons, and later with Corporal Graham (together with her husband, Mike Yun), was motivated by an urgent concern for her daughter's safety, and was not related to assisting with a police investigation.[21] The record reflects that the Yuns requested that the police accompany them because of concern about a confrontation with the defendant.[22] We agree with the Superior Court that in bringing police officers to the Virdins' apartment and searching that apartment the Yuns were not acting as agents of the State.[23]

17. *United States v. Shahid*, 7th Cir., 117 F.3d 322, 325 (1997) (citations and quotations omitted); *see also United States v. Cleaveland*, 9th Cir., 38 F.3d 1092, 1093 (1995) ("In determining whether a private party's search implicates the Fourth Amendment, the relevant inquiry is: (1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or further his own ends.").

18. *Shahid*, 117 F.3d at 325; *see also United States v. Koenig*, 7th Cir., 856 F.2d 843, 848 n. 1 (1988) (noting that the agency analysis in the Fourth Amendment context shares the same "highly factual nature" as the common law agency analysis).

19. *Shahid*, 117 F.3d at 325. The defendant also has the burden of establishing government involvement in a private search. *See Cleaveland*, 38 F.3d at 1093.

20. Transcript (Tr.) of 9/21/99, at 3 (Bench ruling).

21. *Cf. United States v. Feffer*, 7th Cir., 831 F.2d 734, 739 (1987) (holding that a numbered IRS *informant* had not been a state agent when she turned over her employer's tax returns to the IRS, because she had "an independent motivation" and "would have continued her search regardless of the [IRS] agent's involvement").

22. Timmons testified that "[Tina] indicated that she was going to send Mike up and to just check the apartment again. I informed her at that point, so we don't have any problems, to make sure that he come to the department and have Corporal Graham... have him go with him." Even if the Yuns would not have gone back without police presence, this establishes only that they were concerned about their safety, not that they were acting in concert with the police. Although Timmons told the Yuns to contact Graham if they went, it was up to the Yuns whether to go back.

23. Virdin relies on the case of *State v. Kahoonei*, Haw.Supr., 83 Hawai'i 124, 925 P.2d 294, 301 (1996), holding that a person's "subjective motivation" for searching is irrelevant to whether she is an agent for the police. This holding makes sense to the extent that it recognizes that through improper police conduct such as improper manipulation a private individual may become an unwitting tool of the government. In that circumstance, present in *Kahoonei* but not in this case, reliance on "subjective motivation" to characterize a

As indicated above, the level of police involvement in the searches is also an issue in this case. Virdin points out that Timmons searched through some rooms himself and jimmied open the locked bedroom door. Before leaving the apartment, he left his business card with a request that Virdin contact him. Graham took similar initiative in searching through parts of the apartment himself. Virdin argues that these activities are not consistent with a private search, and were undertaken to gather information rather than to assist the Yuns with their search for their daughter.

The trial court ruled that "the role of the police on the facts of this case did not transform the private search by the Yuns into a search by the government." [24] Relatedly, the trial court found that "the police presence in each instance before the discovery of the body, was not for any investigative purpose but only at the request of Mrs. Yun to keep the peace should there be a confrontation with the defendant." The trial court referred to the officers as having "witnessed" the private search. [25]

■ The trial court's conclusions do not entirely address the issue whether Timmons and Graham were engaged in a search of the apartment. Although their

*presence* was for the Yuns' safety, it is not clear on this record whether this also provides the rationale for their decision to look through the apartment. [26] It is not entirely accurate to say that they merely "witnessed" a search by the Yuns. Each officer looked through the apartment on his own. Graham, for instance, looked into the bathroom, and, once in the bedroom, went to check a closet. Timmons walked through rooms alone and unlocked the bedroom door in order to look inside that room. Viewed in the abstract, to the extent they were not motivated by the need to protect the Yuns, these are searches. [27] Private initiation of a search does not serve as a "Trojan horse" for investigation that goes beyond the scope of the private search. [28]

Nevertheless, we are not required in this case to determine exactly which police activity was in the service of the Yuns and which police activity crossed the line into a search of that apartment for other purposes that could trigger constitutional protections. Assuming *arguendo* that Timmons and Graham engaged in illegal searches, such searches yielded no evidence to suppress.

■ Timmons found no evidence during his visit to the apartment and did not uncover anything leading to a later discov-

---

search would be misguided. Here, however, the Yuns' search for their daughter preceded any police involvement, and it was the Yuns who were responsible for getting the police involved in the first instance.

**24.** Tr. of 9/21/99, at 11 (Bench ruling).

**25.** *Id.* at 10, 925 P.2d 294.

**26.** For example, Timmons stated that he "accompanied her there to make sure we didn't have a domestic" and that he walked through the apartment looking for Virdin. He also stated that we "checked the apartment for her daughter." Graham testified that he and the

Yuns "would just go check the apartment, basically, just to check the welfare, as a public assist, to make sure she's okay." He explained that he looked into the bathroom into the apartment "checking" for Stefanie.

**27.** *Cf. Walter v. United States,* 447 U.S. 649, 100 S.Ct. 2395, 2402, 65 L.Ed.2d 410 (1980) ("The projection of the films was a significant expansion of the search that had been conducted previously by a private party and therefore must be characterized as a separate search.").

**28.** *See id.* (holding that "the Government may not exceed the scope of the private search

ery of evidence. The only evidence obtained during the Graham search was the victim's body. Mike Yun, not Graham, jimmied open the bedroom door.[29] It was the Yuns who found the body. Thus the discovery of the body is simply not imputable to Graham *even if* Graham should have refrained from searching other parts of the apartment.

■ As the trial court found, the Yuns were present on their own initiative and would have been there without Graham. Thus, Graham's presence and actions were only incidental to the evidence Virdin seeks to suppress. We conclude on this record that the minimal and incidental police involvement does not establish a violation of the Fourth Amendment or Article I, § 6 of the Delaware Constitution that would require suppression of any evidence.[30]

### Miranda Issue

Virdin was picked up by the police shortly after becoming a murder suspect and was interviewed by two detectives at the Dover Police Department. At the outset, Virdin was read his *Miranda* rights, which he then waived, agreeing to talk to the police. Virdin argues that his statement to the police should be suppressed because he was under the influence of

drugs when he waived his *Miranda* rights, having taken cocaine earlier in the day. The trial court found that Virdin's waiver was valid because "notwithstanding the Defendant's admission to the use of cocaine earlier in the day, he had the capacity to understand the questions asked and to know what he was saying at the time of his statements to the police."[31] Consequently, the trial court denied the motion to suppress.

■ The issue on appeal is whether the Superior Court's denial of Virdin's pre-trial motion to suppress his statement, made after an evidentiary hearing, was an abuse of discretion.[32] To be effective, the waiver by a suspect in a criminal investigation of the suspect's *Miranda* rights must be knowing, voluntary, and intelligent.[33] The burden is on the State to show the validity of the waiver.[34]

■ We conclude that the trial court did not abuse its discretion when it admitted Virdin's statement into evidence notwithstanding evidence of Virdin's drug intoxication. We have held that although intoxication may make a waiver invalid, "intoxication does not *per se* invalidate an otherwise proper waiver of rights."[35] In his statement to the police Virdin stated that he was "a little bit" under the influ-

---

unless is has the right to make an independent search").

**29.** In this connection, the trial court found that under the circumstances Tina Yun had implied authority to enter the apartment and search for Stefanie under the circumstances. We agree that in this case there was nothing improper about the officers' willingness to allow the Yuns to search through the apartment and enter the locked bedroom.

**30.** We do not reach the State's alternative argument that if a search occurred it was validly consented to by the Yuns.

**31.** Tr. of 9/21/99, at 11–12 (Bench ruling).

**32.** *See Seward v. State*, Del.Supr., 723 A.2d 365, 370 (1999).

**33.** *See Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 1140–41, 89 L.Ed.2d 410 (1986); *Howard v. State*, Del.Supr., 458 A.2d 1180, 1183 (1983).

**34.** *Howard*, 458 A.2d at 1183; *see also id.* (noting that examination must be made of the "totality of the circumstances including the behavior of the interrogators, the conduct of the defendant, his age, his intellect, his experience, and all other pertinent factors") (citation omitted).

**35.** *Id.* (citations omitted).

ence of drugs. He stated that he had taken cocaine at 11 a.m. in the morning, approximately 11 hours before giving the statement. The statement reflects that Virdin had sufficient capacity to "know what he was saying and to have voluntarily intended to say it." [36] He gave a detailed and coherent account of the murder.[37] On this record, there is no basis to conclude that the Superior Court erred in finding that the waiver was constitutionally valid and admitting the statement into evidence.

### Jury Instruction

At a prayer conference regarding jury instructions, the State took the position that the jury should be instructed only on the offense of first-degree murder. Virdin requested instructions on the lesser included offenses to first-degree murder of second-degree murder, manslaughter, and criminal negligence. The trial court instructed the jury on first and second-degree murder, but denied Virdin's request for instructions on manslaughter and criminal negligence. Virdin alleges on appeal that it was error not to give those instructions.

Under 11 *Del. C.* § 206(c), the trial court "is not obligated to charge the jury with respect to a lesser included offense unless there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting the defendant of the included offense." [38]

We need not decide whether there is a rational basis for the lesser included offense instructions sought by Virdin. As noted, the trial court agreed with Virdin that, based on Virdin's confession and expert testimony regarding the cause of death,[39] a jury could find that Virdin did not intend to kill Stefanie. Accordingly, the jury was instructed that it could acquit Virdin of first-degree murder but find him guilty of second-degree murder.

 What differentiates second-degree murder and manslaughter, however, is whether the reckless act resulting in death was committed "under circumstances which manifest a cruel, wicked and depraved indifference to human life." [40] The "distinction is one of degree only." [41] In many, perhaps most cases, whether a reckless act rises to the level of second-degree murder is a determination for the jury to make. In this tragic case, however, the undisputed evidence was that Virdin intentionally sat on top of and began to choke with his hands his wife who was

---

36. *Traylor v. State,* Del.Supr., 458 A.2d 1170, 1176 (1983). Virdin was asked, "Do you understand what we're talking to you about?" and "Do you understand the answers that you're giving us?" He answered "Yes" to each question. *See Howard,* 458 A.2d at 1183.

37. *See id.*

38. *See also Zebroski v. State,* Del.Supr., 715 A.2d 75 (1998).

39. Virdin said in his statement that he and his wife were arguing and that he was telling her, "just don't hit me. I don't like for you to hit me." He then "just lost all control," and he "realized what [he] had done after [he] stood up." Virdin offered expert testimony from Dr. Barbara Wolf that Stefanie died not as a result of manual strangulation but from asphyxiation caused by the combination of her pregnant condition, Virdin sitting on top of her, and being positioned on her back. Virdin also offered expert testimony that Stefanie may have quickly lost consciousness due to a "carotoid sinus reflex" resulting from pressure on her neck. Virdin's counsel argued that these less straightforward causes of death relative to manual strangulation were not perceived by Virdin.

40. *Compare* 11 *Del. C.* § 635 *with* 11 *Del. C.* § 632.

41. Delaware Criminal Code with Commentary 191 (1973).

nine-months pregnant. These actions manifest "a cruel, wicked, and depraved indifference to human life."

Because the jury opted for a first degree murder conviction, we need not decide whether there was a rational basis on this record for the jury to conclude that Virdin's acts could have been reckless without manifesting the other elements of second degree murder. Thus we do not decide if it was error not to instruct the jury on manslaughter. Regarding criminal negligence, the Superior Court determined that a jury could not reasonably conclude that Virdin "fail[ed] to perceive" a risk of death to Stefanie.[42] We need not review the Superior Court's determination on this question.

The elements of manslaughter and criminally negligent homicide [43] must find some modicum of support in the record to rise to the level of what a rational jury would credit. This is not a case like *Capano v. State,* where there was clearly no rational basis for any instruction on lesser included offenses.[44] But we need not decide this issue because any error in not giving instructions on the lesser included offenses of manslaughter and criminally negligent homicide is harmless. This issue is moot because the jury opted for a verdict of first degree murder and thereby rejected the option of second degree murder which is a more serious crime than manslaughter or criminally negligent homicide. .

Because the jury rejected second-degree murder and, in convicting Virdin of first-degree murder, it made a factual determination that he intentionally killed Stefanie, that finding makes it unnecessary for us to make a decision on the other lesser includeds. Therefore, even assuming that it was error not to give the additional lesser included instructions, the issue is moot and any error was harmless.[45]

### *Evidence Issue*

■ Dr. Caplan, the State's expert, gave testimony explaining the manner in which Stefanie's pregnancy contributed to her death.[46] He testified that when a pregnant woman lies on her back she has less oxygen in her blood, and also that the fetus causes elevation of the diaphragm, making it more difficult to breathe. Dr. Caplan opined that these were "factors which... contributed to the death."

In furtherance of Dr. Caplan's testimony, the State introduced a photograph of Stefanie's unclothed corpse lying on its back, and three textbook diagrams depicting the womb of a pregnant woman and a full-term fetus. With respect to the photo-

42. *See* 11 *Del. C.* § 231(d) (defining criminal negligence).

43. Virdin sought a manslaughter instruction under three categories of manslaughter. *See* 11 *Del. C.* § 632(1) (any person who "recklessly causes the death of another person"); 11 *Del. C.* § 632(2) (any person who "[w]ith intent to cause serious physical injury to another person the person causes the death of such person, employing means which would to a reasonable person ... seem likely to cause death"); 11 *Del. C.* § 632(3) (any person who "intentionally causes the death of another person under circumstances which do not constitute murder because the person acts under the influence of extreme emotional disturbance"). Virdin also sought a criminally negligent homicide instruction. *See* 11 *Del. C.* § 631 (any person who "with criminal negligence, [ ] causes the death of another person").

44. *See Capano v. State,* Del.Supr., —— A.2d ——, 2001 WL 980939, Nos. 110 and 149, 1999, Veasey, C.J., slip op. at 104–20 (Aug. 10, 2001).

45. *See Zebroski v. State,* Del.Supr., 715 A.2d 75, 82 (1998); *Lilly v. State,* Del.Supr., 649 A.2d 1055, 1062–63 (1994).

46. During a sidebar conference counsel for Virdin agreed that this issue was in dispute.

graph, Virdin objected that it was highly prejudicial and unnecessary to display to the jury a photograph in which the corpse was naked. The State argued that the photograph would show the jury "the degree to which the pregnancy extends." The trial court conducted the balancing required by D.R.E. 403 [47] and admitted the photograph into evidence.

Similarly, with respect to the diagrams, Virdin objected that they were highly prejudicial because they each depicted a full-term fetus with such details as fingers and toes, and eyes and ears—as Virdin puts it, "a little person." Virdin argues that these details were irrelevant to the expert testimony given by Dr. Caplan regarding the cause of death and cumulative of other evidence regarding Stefanie's pregnancy. The trial court ruled that "the size and weight of the fetus is clearly relevant to the mechanism of death as testified to by the doctor" and found that the probative value outweighed the danger of unfair prejudice. The trial court gave a contemporaneous limiting instruction. [48]

We conclude that the admission of these exhibits was not an abuse of discretion. [49] The exhibits were relevant to the issue of how Stefanie died, which the parties agree was disputed at trial. Caplan gave an extended explanation of how pregnancy affects breathing and may have contributed to Stefanie's death. Notwithstanding that the photograph showed the victim's naked corpse instead of a clothed corpse, the trial court could properly conclude that the photograph was admissible, applying the balancing test of Rule 403. [50] Similarly, the trial court could properly have concluded that the diagrams were admissible, even though they showed a fully developed fetus with certain human attributes. As the State argued during the prayer conference, the likelihood of prejudice is diminished because the jury had already heard that Stefanie was nine months pregnant, and had been given a baby shower and created a nursery. Moreover, as noted above, the trial court gave a limiting instruction that was appropriate to the circumstances of this case. [51]

47. Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of issues."

48. The jury was instructed that "the exhibits which have just been introduced are being introduced for the limited purpose of assisting you in understanding the witness' testimony as to cause of death. You may consider them for that purpose only and no other."

49. See Lynch v. State, Del.Supr., 588 A.2d 1138, 1141 (1991) ("[T]he determination of whether the probative value of a particular piece of evidence is substantially outweighed by the danger of unfair prejudice is a matter which falls particularly within the discretion of the trial judge, who has the first-hand opportunity to evaluate relevant factors.") (citing Williams v. State, Del.Supr., 494 A.2d 1237, 1241 (1985)).

50. Delaware Rule of Evidence (D.R.E.) 403. See Keperling v. State, Del.Supr., 699 A.2d 317, 319 (1997) ("The fact that a photograph of the victim may be gruesome or unpleasant does not render it inadmissible."); cf. Casalvera v. State, 410 A.2d 1369, 1373 (1980) (noting that a prosecutor is not "required to select[ ] the least dramatic means of presenting his evidence").

51. See Keperling, 699 A.2d at 320. In Keperling, we stated that "the manner in which the Superior Court evaluated and ruled upon the use of the photographic slides was a model of proper procedure." Virdin argues that Keperling is distinguishable because in this case there was no voir dire of the expert to determine the relevancy of the exhibits, and the limiting instruction in this case was perfunctory relative to the one given in Keperling. We have considered these factors in determining that the trial court did not abuse its discretion.

## Conclusion

We find no reversible error and affirm the judgment of the Superior Court.