ORIN TURNER, Defendant Below, Appellant,
v.
STATE OF DELAWARE, Plaintiff Below, Appellee.
No. 25, 2008.
Supreme Court of Delaware.
Submitted: August 6, 2008.
Decided: September 10, 2008.
Thomas D. Donovan, Esquire, Dover, Delaware, for appellant.
John Williams, Esquire, Department of Justice, Dover, Delaware, for appellee.
Before STEELE, Chief Justice, HOLLAND and JACOBS, Justices.
HOLLAND, Justice:
This is a direct appeal by the defendant-appellant, Orin Turner ("Turner"), from final judgments of conviction that were entered by the Superior Court. After a jury trial, Turner was found not guilty of the lead offense of Attempted Murder in the First Degree, but guilty of the following nine violent felonies: Assault in the First Degree (a lesser-included offense to Attempted Murder in the First Degree), Aggravated Menacing, Burglary in the Second Degree, Reckless Endangering in the First Degree, Possession of a Firearm During the Commission of a Felony (four counts), and Carrying a ZConcealed Deadly Weapon.
On November 16, 2007, the State filed a petition seeking habitual offender status and sentencing for each of Turner's convictions. At the sentencing hearing held on December 13, 2007, the Superior Court granted the State's petition and then sentenced Turner to two life terms plus eighty-seven years at Level V incarceration. In so doing, the Superior Court enhanced Turner's sentence under the habitual offender statute for two of his nine violent felonies.
On appeal, Turner claims that the Superior Court erred in, first, denying his motion to suppress evidence, and, second, sentencing him to two life terms plus eighty-seven years at Level V incarceration. We have concluded that both of those contentions are without merit.

Facts
On September 18, 2006, Detectives Jeff Melvin and Eric Richardson responded to an emergency call regarding a shooting at the Mishoe Towers apartment complex in Dover, Delaware. Michael Bordley ("Bordley") told the police that while he was in apartment 303 visiting his girlfriend Carol Murray ("Murray") and her son Jonathan (aged 13), a man named "House" (later identified as Turner) entered the apartment and shot Bordley.
Both Bordley and Jonathan testified at trial and positively identified Turner as the shooter. Jonathan testified that Turner knocked on the door and then entered the apartment, carrying a silver revolver wrapped in an orange cloth. A woman entered the apartment with him. When Turner entered the bedroom and pointed the gun at Murray and then at Bordley, the woman pushed Jonathan outside the apartment door and into the hallway. From the hallway, Jonathan heard a gunshot coming from inside the apartment.
Bordley also testified that Turner first pointed the gun at Murray, tried to fire it, but the gun did not go off. Turner then pointed the gun at Bordley, fired it, and immediately exited the apartment. After Turner left, Bordley went to the elevator. The police, who arrived shortly thereafter, found Bordley lying inside the elevator on the bottom floor with a gunshot wound to his upper abdomen.
Later that evening, Detective Melvin obtained a warrant for Turner's arrest. The arrest warrant included a charge of Conspiracy in the First Degree, specifically that Turner "agree[d] with another person, an unknown black female named `Rasheeta', to engage in . . . Attempted Murder 1st Degree." According to the affidavit of probable cause, Murray had "observed a black male nicknamed `House' and a black female named 'Rasheeta' standing in the doorway of the bedroom." It was soon determined that "Rasheeta" was Turner's girlfriend and that her full or real name was Machita Crump ("Crump").
The next day, September 19, 2006, Turner and Crump were arrested at a WaWa convenience store and taken to the Dover Police Station. Crump, who was interviewed first, "stated that she walked into the building but [that she] was away from the apartment" when the shooting occurred. Detective Melvin "felt she did not commit th[e] crime" and decided not to file any charges against Crump in connection with Bordley's shooting. Nevertheless, Crump was not immediately released because she had other pending charges and three outstanding capiases.
Detective Melvin then questioned Turner, after reading him the Miranda warnings. Turner "denied any involvement, denied being at the scene, [and] stated that he was at the residence . . . the day before, but not on the day that [the shooting] actually happened." According to Turner, Murray owed Turner $200 and that was the reason for Turner's visit to her apartment the day before the shooting occurred.
When the interview concluded, Detective Richardson escorted Turner to the bathroom. While in the bathroom, Turner told Detective Richardson that he did not want Crump to go to prison and that, if Richardson could get Crump released, Turner would "tell [the police] everything." Richardson responded that he "could make a recommendation" to the Justice of the Peace Court magistrate and "would try to get [Crump] released." Following that conversation, it was agreed that Turner and Crump would be taken to the Justice of the Peace Court for their initial appearances and that afterwards Turner would be brought back to the police station for a second interview.
After Turner was processed and provided with copies of the arrest warrant and affidavit of probable cause, Detectives Melvin and Richardson took him and Crump to Justice of the Peace Court 7. Crump was presented to the Justice of the Peace Court magistrate first. None of Crump's charges pertained to Bordley's shooting and she was released on unsecured bond. Turner was then presented to the Justice of the Peace Court magistrate, who reviewed his charges (including the conspiracy charge), set bail in the amount of $159,000 in cash, and ordered Turner committed in default of bail.
After the Justice of the Peace Court hearing, Turner was brought back to the police station and a second interview was conducted. Before any questioning began, Detective Melvin stated:
I will read you your rights again. You heard them earlier, [and] you heard them from the judge. You have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to talk to a lawyer and have him present with you while you're being questioned. If you cannot afford to hire . . . a lawyer, one will be appointed to represent you before any questioning, if you wish one. If you decide to answer any questions with or without an attorney present, you may stop at any time during questioning. Do you understand these rights [that] I explained to you?
And with these rights in mind do you wish to talk to me? Turner responded in the affirmative, i.e., he understood his rights and wished to talk to Detective Melvin. Turner did not ask for an attorney to be present during questioning, nor did he ask to talk to an attorney before being interviewed. Turner then told Detective Melvin that he went to Murray's apartment the day before the shooting because Murray owed him $200. Murray did not have the money and Turner decided to come back the next day. Without informing "his wife" (Crump) of his intentions, Turner asked Crump to meet him at Mishoe Towers. Both entered Murray's apartment, but when Turner pulled out the gun, Crump ran out of the room and dragged Jonathan outside the apartment. Turner said that he just wanted to scare Bordley and did not mean to shoot anybody. He said that he aimed at a wall and then calmly exited the apartment and the building. Crump was outside waiting for him in a car. Upon seeing the paramedics arrive, Turner realized that he had shot Bordley, but he did not tell Crump anything until they were arrested the next day.

Motion to Suppress Evidence
Turner was indicted on June 5, 2006. On April 12, 2007, Turner moved to suppress the second interview from the State's evidence. Turner's written motion claimed that "the Officers threatened to charge his fiancée [Crump] with Conspiracy for Attempted Murder if he did not admit to being involved in the shooting." A suppression hearing was held on the afternoon of October 15, 2007, the day before the trial was scheduled to commence.
At the hearing, Turner's counsel argued that, first, Turner's confession was coerced in violation of his Fifth Amendment rights, and second, Turner did not have an attorney present at his second interview in violation of his Sixth Amendment right to counsel. The State objected to the trial judge considering Turner's Sixth Amendment argument because it had not been presented in his written motion to suppress. The Superior Court upheld the objection and stated:
[Turner] is now at the eleventh hour attempting to alter his motion from a Fifth Amendment motion regarding coercion to a Sixth Amendment claim for right to counsel for a defense. Up until this point he has relied upon a motion filed [six] months ago . . . and the new issue is fundamentally . . . different, and out of time. . . . [Given] the late[ness] of bringing up this [new claim] . . . combined with the probability that the claim [would] not [have] been successful anyway, based upon the law, . . . [Turner] is going to be prohibited from basing his motion to suppress on anything other than coercion.
On the issue of coercion, the Superior Court heard testimony from Turner, Detective Melvin and Detective Richardson. Turner testified that he confessed because the detectives "said that [Crump] was being charged with [him] on conspiracy first, the attempted murder," and because the conspiracy charge was referenced in the arrest warrant, in the affidavit of probable cause and during the Justice of the Peace Court hearing. Turner further testified that Detective Richardson told him that "if [Turner] didn't do it, [Crump] did it," and "one of [them] [wa]s going to do life."
Detective Richardson testified that neither he nor Detective Melvin ever told Turner that Crump would be charged with any crime related to Bordley's shooting. Detective Melvin admitted that he informed Turner of Crump's outstanding capiases and pending charges. But, Detective Melvin testified, neither he nor Detective Richardson ever told Turner that, unless he confessed, Crump would be charged with attempted murder or conspiracy for Bordley's shooting or that Crump would go to jail for the rest of her life. Detective Melvin did not recall, however, whether he expressly told Turner that Crump would not be charged in connection with Bordley's shooting.
At the end of the suppression hearing, the Superior Court denied Turner's motion, finding that there was no evidence of coercion, and ruled:
There is nothing demonstrated here by any stretch of any extrinsic police or state pressure. It is noted that the defendant does have ample experience in the criminal justice system . . . [and] that the behavior of the police officers was polite. . . . There is clearly the observation and advising of his rights. . . . I think [that Turner's] will was not overborne. His will was utterly carried out, which is to say, he wanted to produce a second statement at his insistence.
In this appeal, Turner claims that in denying his motion to suppress the second interview from the State's evidence, the Superior Court erred in two respects: first, by finding that his rights under the Fifth Amendment were not violated because his confession was made knowingly and voluntarily; and second, by refusing to consider the merits of his Sixth Amendment argument, on the ground that it was untimely presented and ultimately lacked merit.

Turner's Fifth Amendment Claim
Turner contends that the Superior Court erred in finding that his confession was knowing and voluntary. When assessing the voluntariness of a defendant's incriminating statement to the police, this Court examines the totality of the circumstances under which the statement was given to determine whether the defendant's will was overborne.[1] To the extent that the trial court's legal decision on a motion to suppress is based on its own factual findings, our review is limited to a determination of whether there was sufficient evidence to support the findings.[2] We will not disturb findings of fact by the trial judge unless they are clearly erroneous.[3]
Turner testified that the officers threatened to charge Crump with conspiracy to attempted murder if he did not confess.[4] Both Richardson and Detective Melvin testified, however, that neither of them ever told Turner that, unless he confessed, Crump would be charged or would go to jail for the rest of her life.[5] The trial judge, sitting as the finder of fact at a pretrial suppression hearing, determines witness credibility. The trial judge found the officers' testimony to be more credible than Turner's.[6]
Turner also testified that he was coerced to confess because the officers gave him copies of the arrest warrant and affidavit of probable cause, which referenced the charge of conspiracy with Crump to commit attempted murder, and the officers mentioned that charge at his Justice of the Peace Court hearing. But, the officers were required by the law to take those actions. Turner's internal and subjective belief that Crump would be charged (based on his interpretation of his charges) does not amount to coercion. Coercion must emanate from an external source, specifically, from law enforcement officials.[7]
The record indicates that Turner's concern that Crump would be charged was alleviated after the Justice of the Peace Court hearing. Turner was present in the courtroom when the charges against Crump were read and none of those charges pertained to Bordley's shooting. Crump was then released on unsecured bond and was never charged with any crimes in connection with Bordley's shooting.
Thereafter, Turner agreed to return to the police station for a second interview. It is undisputed that Turner had spontaneously suggested to Richardson that he would "tell [the police] everything" if Crump was released and that Turner agreed to be brought back to the police station after the Justice of the Peace Court hearing for a second interview. The record further shows that each of the two interviews was less than one hour long and that Turner was allowed to use the bathroom and have a cigarette break.
Finally, Turner claims that he was not properly advised of his Miranda rights. The record does not support that assertion. Detective Melvin read Turner his Miranda rights again at the beginning of the second interview and Turner reiterated his desire to confess.[8] Given the totality of the circumstances, we hold that the trial judge properly concluded that Turner knowingly, voluntarily and intelligently waived his Fifth Amendment right to remain silent.

Sixth Amendment Claim Waived
Turner's next contention is that the Superior Court abused its discretion by not allowing Turner's new counsel to add orally, at the suppression hearing, an additional ground that was not mentioned in the written motion to suppress filed by Turner's previous counsel. We review for abuse of discretion the Superior Court's denial of a pre-trial motion to suppress as untimely or, after conducting an evidentiary hearing, as lacking merit.[9] We review de novo, however, the trial court's formulation and application of legal concepts to undisputed facts.[10]
There are no rules that directly govern oral amendments to written motions to suppress. The rules governing pre-trial motions in general, and motions to suppress in particular, are instructive. Superior Court Criminal Rules 12(b)(3) and 41(f) provide that a motion to suppress evidence "may be written or oral at the discretion of the judge"[11] and "shall state the grounds upon which it is made with sufficient specificity to give the state reasonable notice of the issues and to enable the court to determine what proceedings are appropriate to address them."[12]
Motions to suppress "must be raised prior to trial"[13] and "[t]he court may . . . set a time for the making of pre-trial motions."[14] These requirements are further detailed in the Superior Court's Criminal Case Management Plan, which relevantly states:
Pretrial motions, including motions to suppress, and all motions under Rule[s] 12, 14, 16, and 41 of the Superior Court Criminal Rules must be filed within 10 days following Initial Case Review unless otherwise ordered by the Court. It is necessary that these motions be timely filed to allow the scheduling of any evidentiary hearings prior to Final Case Review. The motion must state with particularity the specific legal and factual grounds counsel in good faith believe support the motion, as well as any controlling legal authorities. Failure to comply with this requirement may result in the motion being denied without further hearing or argument. In addition, any applicable motion filed after the deadline must include a motion for leave to file out of time, which must specifically set forth the justification for the delay.[15] Turner's written motion to suppress was filed on April 12, 2007, by Kathryn J. Garrison, Turner's counsel at that time.[16] On June 13, 2007, Garrison moved to withdraw as Turner's counsel and Thomas D. Donovan was appointed to represent Turner on June 18, 2007. Donovan was Turner's counsel at the suppression hearing, which took place on October 15, 2007, the day before the trial was scheduled to commence. Therefore, Turner's new counsel had almost four months during which he could have moved for leave to amend the written motion to suppress.
The record and the parties' submissions on appeal disclose no reason for counsel's failure to raise the Sixth Amendment claim earlier. In addition, the cases on which Turner relied at the suppression hearing in support of his Sixth Amendment argument were not cited in the written motion to suppress, which was based upon Fifth Amendment grounds. Thus, defense counsel's attempt to supplement the motion does not comply with the requirement that the grounds for suppression be presented "with sufficient specificity to give the state reasonable notice of the issues." Accordingly, we hold that the trial judge did not abuse his discretion in refusing to consider the merits of Turner's Sixth Amendment claim.

Sixth AmendmentNo Plain Error
Alternatively, Turner argues that, even if we find no abuse of discretion, we should review the merits of his Sixth Amendment claim for plain error.[17] One reason that the trial judge "prohibit[ed] [Turner] from basing his motion to suppress on anything other than coercion" was "the probability that [his Sixth Amendment] claim [would] not [have] been successful anyway." We agree.
The record reflects that the evidence relating to Turner's Fifth Amendment claim, which was presented at the suppression hearing, is sufficient to support a finding that Turner knowingly, voluntarily and intelligently waived his right to counsel under both the Fifth and the Sixth Amendments.
A defendant's right to counsel under the Sixth Amendment attaches "at or after the time that adversary judicial proceedings have been initiated against him."[18] We have held that a "defendant's initial appearance in the Justice of the Peace Court qualifie[s] as the initiation of the adversary process."[19] Therefore, Turner's Sixth Amendment right to counsel had attached at the time of the second interview, which occurred immediately after the Justice of the Peace Court hearing. We have also noted that the waiver of a Sixth Amendment right to counsel is a more difficult standard to satisfy than the waiver of a Fifth Amendment right to counsel. A Sixth Amendment waiver can only be established with "some form of affirmative overt action by the defendant which indicate[s] his willingness to talk to law enforcement officers."[20]
Turner initiated the conversation in the bathroom and offered to "tell [the police] everything" if Crump was released.[21] After the arraignment, consistent with his request, Turner was given his Miranda rights again and questioned. In Patterson v. Illinois, the United States Supreme Court held that "an accused who is admonished with the [Miranda] warnings . . . has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one."[22] The defendant in Patterson had received and waived the Miranda warnings prior to his post-indictment questioning.[23] Similarly, in United States v. Percy, the 9th Circuit held that there was no Sixth Amendment violation when a federal agent interviewed the defendant after his arraignment because the defendant never invoked his right to counsel, was advised of his Miranda rights and waived them.[24] Turner was advised of his right to have an attorney present during the second interview, but he did not request one. Instead, Turner reaffirmed his desire to confess. Turner's "ample experience in the criminal justice system" indicates that he understood the nature of the right that he was forfeiting. We hold that the Superior Court did not commit plain error in concluding that Turner's Sixth Amendment claim would have been unsuccessful.[25]

The Sentence
Turner's final claim is that the sentence imposed by the Superior Court as a result of his habitual offender status (two life terms plus 87 years at Level V incarceration) was more severe than that sought by the State.[26] This claim was not presented at the sentencing hearing. Therefore, our review is for plain error.[27]
According to 11 Del. C. 4214(a), if a conviction that forms the basis for the State's petition to declare the defendant an habitual offender is for a violent felony, the court must impose a sentence greater than the statutory maximum, up to life imprisonment (the "penalty-enhancing provision").[28] Turner's nine convictions were all for violent felonies and were all listed in the State's petition seeking habitual offender sentencing. At the sentencing hearing, Turner's counsel argued that, in light of Turner's acquittal of the lead offense (Attempted Murder in the First Degree), the trial judge should apply the penalty-enhancing provision to only one of Turner's nine convictions, not to all. The State took the position that all of Turner's convictions should be enhanced:
[The] felonies [that Turner] is convicted of that are in front of Your Honor today are violent felonies under [11 Del. C. § 4201]. Each and every one of them are violent felonies. . . . All of these [nine] charges form a basis of the State's petition. They are in the petition. That's what we are asking, [that] each and every one of them [be enhanced pursuant to 11 Del. C. § 4214(a)]. We're asking for the maximum under the SENTAC guidelines to be the minimum in this case, which would result in 145 years of minimum-mandatory incarceration.
The prosecutor estimated that, if the penalty-enhancing provision had been applied to each of Turner's nine violent felony convictions, the minimum sentence required to be imposed was 145 years. The maximum sentence that could have been imposed was nine life terms. Despite the State's request for enhancement on all nine convictions, the judge decided to enhance only two of Turner's nine convictions and sentenced him to two life terms (enhanced sentences for Assault in the First Degree and the associated PFDCF), plus an additional term of eighty-seven years for the remaining seven convictions. The sentence was also in compliance with our holding in Kirby v. State because the trial judge did not apply habitual offender status to any greater number of counts than those advanced by the State.[29] Accordingly, the record reflects that the trial judge committed no error, let alone plain error, in sentencing Turner.

Conclusion
The judgments of the Superior Court are affirmed.
NOTES
[1] Dupree v. State, 2005 WL 873313, at *2 (Del. Supr.); Norcross v. State, 816 A.2d 757, 762 (Del. 2003); Fare v. Michael C., 442 U.S. 707, 724-25 (1979); Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973). See also State v. Rooks, 401 A.2d 943, 948 (Del. 1979) (enumerating a list of factors to be considered in determining whether a defendant's will was overborne, such as the behavior of the interrogators, the age, education and intelligence of the accused, the defendant's prior criminal history and experience in dealing with law enforcement, whether he was read the Miranda rights, the length of detention, the repeated nature of the interrogation, whether subterfuge was used in obtaining the statement, etc.).
[2] Virdin v. State, 780 A.2d 1024, 1030 (Del. 2001) (citing Downs v. State, 570 A.2d 1142, 1144 (Del. 1990)).
[3] State v. Henderson, 892 A.2d 1061, 1066 (Del. 2006); Lopez v. State, 861 A.2d 1245, 1248-49 (Del. 2004); Woody v. State, 765 A.2d 1257, 1261 (Del. 2001).
[4] Turner's testimony is somewhat confusing because he also stated that "Detective Melvin said [Crump] wasn't being charged with this here, with the incident of the shooting, but when I g[o]t [a copy of the arrest warrant] it sa[id] that I [had] a conspiracy first charge."
[5] The record does not clearly disclose whether the detectives expressly told Turner that Crump was not going to be charged in connection with Bordley's shooting. Melvin admitted that he made that decision immediately after interviewing Crump and before his first interview with Turner. But, the detectives were under no obligation to keep Turner updated regarding the progress of their investigation. Nor could Turner's arrest warrant be modified at that point to exclude the conspiracy charge. Ultimately, a nolle prosequi was entered on the conspiracy charge the morning before the suppression hearing.
[6] See Knight v. State, 690 A.2d 929, 932 (Del. 1996) (noting that "the trier of fact `is the sole judge of credibility of the witnesses and responsible for resolving conflicts in testimony'" (quoting Tyre v. State, 412 A.2d 326, 330 (Del. 1980))). See also Pryor v. State, 453 A.2d 326, 330 (Del. 1980).
[7] "'The sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion.' `[T]he voluntariness of a Miranda waiver [does not] ... require an abstract inquiry into the defendant's `free will' or subjective view of reality.' Such voluntariness does not concern `moral or psychological pressures to confess emanating from sources other than official coercion.'" State v. Shirey, 2002 WL 316595, at *3 (Del. Super.) (quoting DeJesus v. State, 655 A.2d 1180, 1192 (Del. 1995); State v. Russo, 700 A.2d 161, 174 (Del. Super. 1996); Oregon v. Elstad, 470 U.S. 298, 305 (1985)) (emphasis omitted). See also State v. Augustino, 1992 WL 357873, at *13 (Del. Super.) (citing Colorado v. Connelly, 479 U.S. 157, 167 (1986) (holding that "coercive police activity is a necessary predicate to the finding that a confession is [involuntary]").
[8] When Turner had first indicated his desire to confessduring the bathroom break after the first interviewhe was unaware of the conspiracy charge because he had not yet been provided with copies of the arrest warrant and affidavit of probable cause.
[9] Mathis v. State, 2008 WL 2083148, at *2 (Del. Supr.); Morris v. State, 2003 WL 22097056, at *2 (Del. Supr.) (citing Pennewell v. State, 2003 WL 2008197, at *1 (Del. Supr.)); Norcross v. State, 816 A.2d 757, 762 (Del. 2003); Virdin v. State, 780 A.2d 1024, 1030 (Del. 2001) (citing Seward v. State, 723 A.2d 365, 370 (Del. 1999)); Barnett v. State, 691 A.2d 614, 616 (Del. 1997); Liu v. State, 628 A.2d 1376, 1379 (Del. 1993) (citing Alston v. State, 554 A.2d 304, 308 (Del. 1989)).
[10] Ares v. State, 937 A.2d 127, 130 (Del. 2007); Donald v. State, 903 A.2d 315, 318 (Del. 2006) (citing Jones v. State, 745 A.2d 856, 860 (Del. 1999)).
[11] Super. Ct. Crim. R. 12(b)(3).
[12] Super. Ct. Crim. R. 41(f).
[13] Super. Ct. Crim. R. 12(b)(3).
[14] Super. Ct. Crim. R. 12(c).
[15] Superior Court of Kent County Criminal Case Management Plan 5 (effective June 19, 2002).
[16] The State does not dispute that the initial motion was timely and the record does not disclose what deadline was set by the Superior Court for the filing of such motions. Because the initial written motion to suppress was timely, this case is distinguishable from the cases on which the State relies for the proposition that "[a] motion to suppress filed on the eve of trial need not be considered in the absence of exceptional circumstances." See Mathis v. State, 2008 WL 2083148, at *2 (Del. Supr.) (quoting Morris v. State, 2003 WL 22097056, at *2 (Del. Supr.)); Pennewell v. State, 2003 WL 2008197, at *1-2 (Del. Supr.); Barnett v. State, 691 A.2d 614, 616 (Del. 1997).
[17] According to Superior Court Criminal Rule 12(f), "[f]ailure by a party . . . to make requests which must be made prior to trial, at the time set by the court pursuant to [Superior Court Criminal Rule 12(c)], . . . shall constitute waiver thereof." We have held that "[t]his Court may excuse a waiver, however, if it finds that the trial court committed plain error requiring review in the interests of justice." Monroe v. State, 652 A.2d 560, 563 (Del. 1995). See also Mathis v. State, 2008 WL 2083148, at *3 (Del. Supr.) (finding that the trial court did not abuse its discretion in denying a motion to suppress as untimely but reviewing the merits of the motion for plain error pursuant to Supreme Court Rule 8).
[18] Deputy v. State, 500 A.2d 581, 589 (Del. 1985) (citing Kirby v. Illinois, 406 U.S. 682, 689 (1972)).
[19] Id. at 590 (citing Flamer v. State, 490 A.2d 104, 114 (Del. 1984)).
[20] Id. at 591.
[21] The reason why the second interview was conducted after the Justice of the Peace Court hearing (when Turner's Sixth Amendment right attached) and not before (when Turner's Sixth Amendment right had not yet attached) was that Turner first "wanted to watch ... Crump get released from jail."
[22] Patterson v. Illinois, 487 U.S. 285, 296 (1988).
[23] Id. at 292-93.
[24] U.S. v. Percy, 250 F.3d 720, 726-27 (9th Cir. 2001).
[25] The test developed by this Court for determining whether a defendant effectively waived his Sixth Amendment right to counsel requires the State to show: "(1) that the defendant comprehended the nature of the right which he was forfeiting; (2) that defendant either by his own words or conduct, indicated an affirmative desire to relinquish these rights; (3) and that he did so voluntarily." Deputy v. State, 500 A.2d at 591.
[26] Turner does not challenge the Superior Court's decision to declare him an habitual offender.
[27] Supr. Ct. R. 8; Czech v. State, 945 A.2d 1088, 1097 (Del. 2008).
[28] Section 4214(a) relevantly states:

Any person who has been 3 times convicted of a felony . . . and who shall thereafter be convicted of a subsequent felony of this State is declared to be an habitual criminal, and the court in which such 4th or subsequent conviction is had, in imposing sentence, may in its discretion, impose a sentence of up to life imprisonment upon the person so convicted. Notwithstanding any provision of this title to the contrary, any person sentenced pursuant to this subsection shall receive a minimum sentence which shall not be less than the statutory maximum penalty provided elsewhere in this title for the 4th or subsequent felony which forms the basis of the State's petition to have the person declared to be an habitual criminal except that this minimum provision shall apply only when the 4th or subsequent felony is a Title 11 violent felony, as defined in § 4201(c) of this title.
[29] Kirby v. State, 1998 WL 184492, at *2 (Del. Supr.). See also State v. McKamey, 2003 WL 22852614, at *8-9 (Del. Super.); Hawkins v. State, 2002 WL 384436, at *2 (Del. Supr.); Reeder v. State, 2001 WL 355732, at *3 (Del. Supr.).