IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE      :
                       :
                       :      Case No. 1810006157
v.                     :      Kent County
                       :
MATTHEW D. FROST,      :
        Defendant.     :

Submitted: May 8, 2019
Decided: May 28, 2019

## ORDER

Defendant's Motion to Suppress.
*Granted.*
Defendant's Motion to Reopen Evidence.
*Denied as Moot.*

Lindsay A. Taylor, Esquire of the Department of Justice, Dover, Delaware; attorney for the State.

Stephanie H. Blaisdell, Esquire of the Office of the Public Defender, Dover, Delaware; attorney for the Defendant.

WITHAM, R.J.

## INTRODUCTION

This opinion constitutes the Court's decision in the matter of Defendant Matthew Frost (hereinafter "Defendant") and his Motions to Suppress and Reopen Evidence. Defendant moves to suppress evidence collected pursuant to a traffic stop and warrantless search conducted by the Delaware State Police on October 11, 2018. After the Court had initially decided the matter, the State, pursuant to Superior Court Rule of Civil Procedure 59(e), filed a Motion for Reargument. Upon reconsideration, the Court granted the State's motion because it found it had misapplied certain legal and evidentiary principles. Subsequent to that order, Defendant filed a Motion to Reopen Evidence.

Today, the Court intends to resolve both matters and accordingly, the Court's March 12, 2019 order is hereby vacated.

After considering the parties' motions, oral arguments, and the record in its entirety, the Court finds the State has sufficiently demonstrated probable cause to conduct a traffic stop on Defendant and that reasonable, articulable suspicion existed to justify the first extension of the stop. However, the Court also finds that the State has failed to demonstrate additional reasonable, articulable suspicion to justify extending the stop for a second time. The State has further failed to demonstrate probable cause to justify the warrantless search conducted by the officers on Defendant's vehicle, where drugs and drug paraphernalia evidence was seized.

Accordingly, and for the reasons that follow below, the Defendant's Motion to Suppress is **GRANTED**. All drug and drug paraphernalia evidence seized as a

2

result of the unlawful search, must be suppressed. The Defendant's Motion to Reopen Evidence is hereby **DENIED** as moot.

## FACTS

On October 11, 2018 at approximately 1:00 p.m., Delaware State Police Officer First Class Holl (hereinafter "Tfc. Holl") was on routine patrol and observed Defendant's vehicle failing to signal before exiting onto Exit 98 from Route 1.[1] Tfc. Holl and Corporal Goertz (hereinafter "Cpl. Goertz") initiated a traffic stop of Defendant's vehicle due to the traffic violation.

Tfc. Holl initiated contact with Defendant, the sole occupant of the vehicle, through the passenger side window, while Cpl. Goertz observed from the driver's side door.[2] From the onset of the traffic stop, Tfc. Holl testified that Defendant was "extremely nervous," more so than the average motorist.[3] He also testified that after he requested Defendant's license and registration,[4] Defendant: (1) moved his hands frantically within the vehicle;[5] (2) bounced a cigarette between his fingers like a

---

[1] Suppression Hearing TR (hereinafter "TR") at 6:1-3.

[2] St . Reply Ex. 1 (hereinafter "St. Ex. 1") at 01:00:53-54.

[3] TR at 7:19-20. Tfc. Holl's characterization of the Defendant's behavior was significantly more elevated than the State's characterization as simply "nervous." *See* St. Reply to D. Mot. to Suppress at ¶¶ 2-3,18-19. *But cf.* St. Ex. 1 (MVR footage appears to coincide with the State's characterization, rather than Tfc. Holl's "Richter scale" articulation.).

[4] *Id.* at 08:2-3. *See also* St. Ex. 1 at 01:00:54-57 (Tfc. Holl appears to ask Defendant *only* for his license and registration.).

[5] TR at 08:3-4.

3

"Ritcher Scale" needle;[6] (3) displayed a delayed response when asked for his insurance card;[7] (4) failed to make eye contact;[8] and (5) quickly opened and shut the center console.[9] Tfc. Holl further testified that Defendant did not have proof of insurance,[10] but that Defendant indicated that his insurance information was located on the GEICO application (hereinafter "app") via his cellular telephone.[11]

As Defendant attempted to bring up the GEICO app, Tfc. Holl queried him regarding his travel prior to the traffic stop.[12] Defendant, without hesitation or confusion, responded he had come from North Smyrna and had given "Ashley" a ride home.[13] When Tfc. Holl pressed Defendant for Ashley's last name, he could not recall it, but stated that she was a friend of "Nick's."[14] Based on Defendant's "vague"[15]

---

[6] *Id.* at 08:8-9.

[7] *Id.* at 08:10-11. *Cf.* St. Ex. 1 at 01:00:54-57 (Tfc. Holl is not heard asking for insurance.).

[8] *Id.* at 08:12.

[9] *Id.* at 08:13-14.

[10] *Id.* at 08:4-5.

[11] *Id.* at 08:17-18.

[12] St. Ex. 1 at 01:01:26.

[13] *Id.* at 01:01:29-37 (Ashley's existence has never been confirmed.).

[14] *Id.* at 01:01:42-58 (Defendant identified Nick as a co-worker, but could not recall his last name.).

[15] TR at 9:5.

4

answers and behaviors, Tfc. Holl "concluded" that "[Defendant] was making up a story"[16] and was involved in criminal activity.[17]

After a brief period,[18] Defendant was unable to produce his insurance information and Tfc. Holl asked him to exit the vehicle.[19] Defendant did not do so immediately, but asked, amongst other things, about being detained.[20] Tfc. Holl informed Defendant that he was being detained and he wanted to talk.[21] Defendant complied and slowly maneuvered his way out of the vehicle.[22] After he limped to the

---

[16] TR at 9:9-5.

[17] *Id.* at 10:4. Tfc. Holl's testified:

> Sure. People are generally nervous when they see the police sure. But all these indicators I saw from [the Defendant], the totality of the circumstances of him providing vague answers, him failing to make eye contact with me, the violent shaking in his hands, and it was apparent when he was holding his cigarette. Like I said, it looked like a Richter Scale just going off. And when he was frantically moving–just for the insurance card, he reached into the center console and shut it real quick. When he looked in the glove box, he was frantically moving about the vehicle, and I didn't feel safe. I didn't know what was going on. The totality of all these indicators I deemed was criminal activity afoot.

[18] St. Ex. 1 at 01:02:14-01:02:57 (43 seconds had elapsed).

[19] *Id.* at 01:02:57.

[20] *Id.* at 01:03:02-10.

[21] *Id.* at 01:03:02-05; 01:03:11-13. *But see also* TR at 11:8-9 (MVR footage contradicts Tfc. Holl's testimony. Tfc. Holl testified that he walked over to the driver's side and said "Yes. Can you step out of the vehicle for further questioning.").

[22] *Id.* at 01:03:32 (Defendant clearly displayed signs of injury and a limp that was noted by the officers upon his exit and after his arrest. *See Id.* at 01:03:37-40; 01:12:57. Defendant also later states he can not bend his leg due to a hip replacement. *Id.* at 01:05:43-51. The Court also notes

rear of the vehicle, Tfc. Holl asked Defendant if he had a knife and Defendant immediately disclosed that he did.[23] He further disclosed possession of $200 that he received via disability payments.[24] Two seconds later, Cpl. Goertz queried Defendant regarding the picture on his identification card.[25] Defendant stated the picture was old and amplified his previous answer regarding his monthly disability payments and disclosed that he had a daughter.[26]

At this point, and for the first time, Tfc. Holl informed Defendant that he had observed drug paraphernalia that contained heroin residue in plain view on the passenger seat.[27] Tfc. Holl testified that based on his training and experience,[28] he knew the blade/nail file[29] was utilized by heroin users to scrape heroin residue from

---

Defendant appears to have some difficulty hearing, as was evidenced during the hearings.).

[23] *Id.* at 01:03:42-45.

[24] St. Ex. 1 at 01:04:09-12 (The Court interprets this answer as the Defendant accounting for how he acquired the money.).

[25] *Id.* at 01:04:14.

[26] *Id.* at 01:04:17-30.

[27] *Id.* at 01:04:41-52.

[28] TR at 05:02-05; 05:14 (Tfc. Holl attended drug investigation courses run by the Drug Enforcement Administration and the Delaware State Police. He also testified that he attended a drug interdiction course and regularly participated in drug investigations.).

[29] A picture was produced by Defendant at the suppression hearing on February 28, 2019, yet the actual blade/nail file was never produced and it was never determined whether the object was a blade or a nail file, so it will be referred to as the "blade/nail file."

baggies.[30] He inquired whether Ashley was a heroin user[31] and asked if she had left "anything in the car that [the officers] need[ed] to know about."[32] Defendant asserted he did not know, but stated Ashley had went to "Connections."[33]

Tfc. Holl then informed Defendant that he and Cpl. Goertz were going to "run through the car,"[34] but further stated "if it is just [the blade/nail file], I'm going to chalk it up to Ashley."[35] After he asked for a second time, Defendant admitted, *for the first time and only after Tfc. Holl's statement*, to possession of marijuana and drug paraphernalia.[36] Tfc. Holl then stated "it's safe to say that it's Ashley's drug paraphernalia."[37]

A subsequent search of Defendant's vehicle revealed marijuana, 5.9 grams of heroin, and other drug paraphernalia. As a result, Defendant was arrested and charged

---

[30] TR at 10:16-22.

[31] St. Ex. 1 at 01:05:08.

[32] *Id.* at 01:04:54-57.

[33] St. Ex. 1 at 01:05:05; 05:08-11. Connections is a drug treatment program that began in 1985 as a single program that supported adults moving from institutionalization into the Delaware community and has expanded to provide residential, Assertive Community Treatment, and outpatient services for adults who suffer from mental illness. *See* www.connectionscsp.org; last accessed May 14, 2019.

[34] *Id.* at 01:05:13-16.

[35] *Id.* at 01:05:19.

[36] *Id.* at 01:05:19-27 (emphasis added).

[37] *Id.* At 01:05:53.

7

with multiple drug offenses including: 1 count of Drug Dealing, a felony, in violation of 16 *Del. C.* § 4752(1); 1 count of Aggravated Possession, a felony, in violation of 16 *Del. C.* § 4752(3); 1 count of Possession of Drug Paraphernalia, a misdemeanor, in violation of 16 *Del. C.* § 4771(a); and 1 count of Possession of Marijuana, a misdemeanor, in violation of 16 *Del. C.* § 4764(a).

## PROCEDURAL HISTORY

Defendant timely filed his motion to suppress evidence on February 6, 2019 and moved to suppress all evidence seized as a result of the warrantless vehicle search. The State's response, in opposition, was timely filed on February 20, 2019. The Court heard the parties' arguments and testimony from Tfc. Holl on February 28, 2019. On March 13, 2019, the Court granted Defendant's motion.[38]

Subsequent to the March 13, 2019 order, the State filed a timely Motion for Reargument on March 20, 2019. The State argued the Court misapplied the law and evidentiary principles in three ways. First, the State argued the Court misapprehended the appropriate standard for probable cause and the facts of the case in a manner that changed the result of the case. Second, it challenged the Court's decision to admit improperly authenticated evidence. Finally, the State asserted the Court misapplied the inevitable discovery doctrine.

Defendant's response, in opposition, was timely filed on March 22, 2019, where he argued that the State failed to establish sufficient grounds for reargument

---

[38] *State v. Frost*, 2019 WL 1200331 (Del. Super. Mar. 13, 2019) (Order).

and asserted that the Court did correctly apply the inevitable discovery doctrine. Furthermore, Defendant argued that Tfc. Holl abandoned pursuing Defendant's valid proof of insurance, and the State only had established speculation that Defendant would not procedure valid insurance.

In its April 2, 2019 Order, the Court granted reargument[39] and held another hearing on May 8, 2019.

As a result of the April 2, 2019 Order, Defendant filed an untimely Motion to Reopen Evidence on April 29, 2019. In that motion, Defendant contends he was denied rebuttal opportunity for rebuttal relating to the Court's decision regarding the inappropriately admitted exhibit. Despite the State's assertion that Defendant's motion was untimely and without good cause,[40] Defendant maintains that under the circumstances, including the complex record of the case, that motion was timely and the lack of rebuttal established good cause to reopen evidence.

## STANDARDS OF REVIEW

On a motion to suppress evidence seized during a warrantless search, the State bears the burden of establishing that the challenged search or seizure did not violate the rights guaranteed a defendant by the United States Constitution, the

---

[39] *State v. Frost*, 2019 WL 1468198 (Del. Super. Apr. 2, 2019) (Order).

[40] The State argued Defendant's motion was untimely and no enlargement had been filed, despite circumstances outside defense counsel's control that were made aware to the Court prior to the hearing. The Court noted those extreme circumstances faced by defense counsel, exercised its discretion, and allowed the motion to be heard despite being untimely.

Delaware Constitution, and Delaware statutory law.[41] The burden of proof is preponderance of the evidence.[42] The trial judge sits as the trier of fact, and determines the credibility of witnesses.[43]

This Court also has "power and authority to reopen, on timely application and for good cause shown, a dismissal of a criminal proceeding, whether entered with or without prejudice."[44] Those powers allow the Court to "undertake whatever action is reasonably necessary to ensure...justice."[45] An application moving a court to reopen a case, even after the parties have rested, is at the Court's discretion.[46]

## DISCUSSION

After considering the record (with a particular attention focused on Tfc. Holl's testimony and recorded statements), and the parties' arguments, the Court finds under the totality of the circumstances particular to this case, Tfc. Holl established a

---

[41] *State v. DuBose*, 2016 WL 1590583, at *3 (Del. Super. Apr. 18, 2016) (citing *Hunter v. State*, 783 A.2d 558, 560–61 (Del.2001)).

[42] *Id.* (citing *State v. Anderson*, 2010 WL 4056130, at *3 (Del. Super. Oct. 14, 2010) (internal citations omitted).

[43] *State v. Brinkley*, 2013 WL 1225869, at *2 (Del. Super. Feb. 19, 2013) (citing *Turner v. State*, 957 A.2d 565, 570–71 (Del. 2008)).

[44] *State v. Coleman*, 2016 WL 3365785, at *3 (Del. Super. June 3, 2016) (citing *State v. Guthman*, 619 A.2d 1175, 1176 (Del.1993) *aff'd*, 184 A.3d 341 (Del. 2018)).

[45] *Id.* (citing *Guthman*, 619 A.2d at 1178).

[46] *Coleman*, 2016 WL 3365785, at *3 (citing *State v. Patnovic*, 129 A.2d 780, 782 (Del. Super. 1957)); *see also Pepe v. State*, 171 A.2d 216, 219 (Del. 1961).

10

probable cause to initiate the traffic stop and reasonable, articulable suspicion to initally extend Defendant's traffic stop. However, Tfc. Holl failed to establish, nor possess, the requisite reasonable, articulable suspicion to believe Defendant possessed drug paraphernalia and/or drugs that extended the traffic stop for a second time, nor did Tfc. Holl possess probable cause to justify a warrantless search of Defendant's vehicle in search of those drugs and drug paraphernalia. As a result, the evidence seized will be suppressed, and accordingly, the record need not be reopened. Thus, Defendant's motion to reopen evidence is now moot.

## A. The Traffic Stop was Supported By Probable Cause

The Court finds Tfc. Holl had probable cause to conduct the traffic stop. A traffic stop is "a seizure of a vehicle and its occupants by the State," and is reasonable if supported by reasonable, articulable suspicion of criminal activity or probable cause to believe that a traffic violation has occurred.[47]

Tfc. Holl testified he observed Defendant fail to use a turn signal when he exited Route 1. This is a violation of Delaware law.[48] Furthermore, Defendant did not dispute he failed to signal.

As a result, Tfc. Holl's testimony of his observation of the Defendant's traffic violation, constitutes "specific and articulable facts which taken together with rational

---

[47] *State v. Coursey*, 136 A.3d 316, 323 (Del. Super. 2016) (citing *Caldwell v. State*, 780 A.2d 1037, 1045 (Del. 2001); *see also Whren v. U.S.*, 517 U.S. 806, 810 (1996); *U.S. v. Brignoni–Ponce*, 422 U.S. 873, 880–81, (1975) (citing *Terry v. Ohio*, 392 U.S. 1, 16–19 (1968)); *State v. Rickards*, 2 A.3d 147, 151 (Del. Super. 2010), *aff'd*, 30 A.3d 782 (Del. 2011)).

[48] 21 *Del. C.* § 4155(b)-(c).

11

inferences from those facts reasonably warrant the intrusion."[49] Therefore, the Court finds the State has met its burden of demonstrating Tfc. Holl had not only reasonable, articulable suspicion to believe that Defendant, as the driver, had just committed a driving offense, but also probable cause when he observed Defendant commit the offense.

## B. The Scope of the Traffic Stop

*i. Tfc. Holl had Reasonable, Articulable Suspicion to initially extend the traffic stop because Defendant initially failed to produce insurance.*

When Tfc. Holl initially ordered Defendant to step out of the vehicle, the Court finds a second unlawful detention did not occur. An officer "may order the driver or a passenger to exit the car after a valid traffic stop, and that order is not a 'seizure' under the Fourth Amendment."[50] So long as such an order does not "measurably extend the duration of the stop," it does not amount to a "second" seizure under the Fourth Amendment.[51]

While a traffic stop must be justified at its inception by reasonable, articulable suspicion of criminal activity, the scope of the stop must also be reasonably related to the stop's initial purpose.[52] Reasonable, articulable suspicion is defined as an

---

[49] *Coursey*, 136 A.3d at 323 (citing *Coleman v. State*, 562 A.2d 1171, 1174 (Del. 1989)).

[50] *Cannon v. State*, 199 A.3d 619, 2018 WL 6575432, at *3 (Del. 2018) (Table) (citing *Loper v. State*, 8 A.3d 1169, 1174 (Del. 2010); *accord Arizona v. Johnson*, 555 U.S. 323, 331 (2009)).

[51] *Id.* (citing *Johnson*, 555 U.S. at 333).

[52] *Coursey*, 136 A.3d at 323 (citing *Tann v. State*, 21 A.3d 23, 26 (Del. 2011)).

officer's ability to point to specific and articulable facts which, combined with all rational inferences, reasonably warrant the intrusion.[53] Reasonable, articulable suspicion is more than an ill-defined hunch; rather, under the totality of the circumstances, the detaining officers must have a "particularized and objective basis for suspecting criminal activity."[54] A law enforcement officer may detain the individual only as long as necessary to effectuate the purpose of the traffic stop.[55] "Any investigation of the vehicle or its occupants beyond that required to complete the purpose of the traffic stop must be supported by independent facts sufficient to justify the additional intrusion."[56]

In *Loper*,[57] the Delaware Supreme Court held that a person, already lawfully detained as a result of a valid traffic stop, is generally not seized a second time when ordered to leave his car, because his mobility is already validly limited.[58] The Supreme Court relied on *Pennsylvania v. Mimms*,[59] where, after weighing the interest

---

[53] *Id.* (citing *Coleman*, 562 A.2d at 1174).

[54] *Robertson v. State*, 596 A.2d 1345, 1350 (Del. 1991) (citing *Terry*, 392 U.S. at 27)).

[55] *Brinkley*, 2013 WL 1225869, at *3 (citing *Caldwell*, 780 A.2d at 1047).

[56] *State v. Huntley*, 777 A.2d 249, 254 (Del. Super. 2000) (citing *Caldwell*, 780 A.2d at 1047).

[57] 8 A.3d 1169 (Del. 2010).

[58] *Loper*, 8 A.3d at 1174 (citing *Dunlap v. State*, 2002 WL 31796193, at *2 (Del. 2002)); *see also Caldwell*, 780 A.2d at 1045 n.27).

[59] 434 U.S. 106 (1977).

of the driver's personal liberty against the safety of the officer, the United States Supreme Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the officer may order the driver to [exit] vehicle without violating the Fourth Amendment...."[60] The Supreme Court further held Loper's further detention was independently supported by reasonable, articulable suspicion based on the defendant's suspicious responses to the officers questions under the totality of the circumstances.[61]

Defendant contends the circumstances of his traffic stop are similar to those addressed by our Supreme Court in *Caldwell*,[62] not *Loper*. This Court, despite recognizing similarities between the cases, finds *Caldwell* distinguishable. In *Caldwell*, the Delaware Supreme Court found that a second seizure occurred when officers immediately ordered the defendant to immediately exit his vehicle that was illegally parked in a fire lane after obtaining his license and registration information because the officer's actions exceeded the permissible scope of the initial traffic stop

---

[60] *Loper*, 8 A.3d at 1174 (citing *Mimms*, 434 U.S. at 107, 111 n.6) ( the Court held that, based on *Mimms*, simply being ordered out of a vehicle, which is already validly stopped, does not automatically amount to a second seizure, absent any "authority ... [or] any cogent legal argument, for why this Court should expand the meaning of 'seizure' under *Jones* [*v. State* (745 A.2d 856 (Del. 1999))] and Article 1, § 6 of the Delaware Constitution, to hold that a person already being lawfully detained as a result of a valid traffic stop is 'seized' a second time when ordered to leave his car.").

[61] *Id.* at 1175 (the *Loper* court further found that the delay Loper experienced as a result of being stopped for a traffic violation, which he conceded was valid, and his passenger's arrest, only lasted a few minutes and was de minimus. *Id.* at 1173.).

[62] 780 A.2d 1037 (Del. 2001).

14

and that it was unreasonable for want of independent facts to support reasonable and articulable suspicion).[63] The *Caldwell* court determined that those facts were insufficient to justify a detention of extended duration and the implementation of more intrusive investigatory measures, including the handcuffing and pat-down of the defendant.[64]

In our case, Defendant was initially stopped for failing to use a turn signal. His detention, however, appears to have been initially extended due to his inability to produce insurance information[65] and exit the vehicle, not by any action by an officer or a passenger. The lack of valid insurance information is an objective factor that, in addition to Defendant's nervousness,[66] the Court finds sufficient to demonstrate reasonable, articulable suspicion to initially extend the traffic stop.[67] Therefore, it

---

[63] *Caldwell*, 780 A.2d at 1049.

[64] *Caldwell*, 780 A.2d at 1049.

[65] Pursuant to Section 2118 of Title 21 of the Delaware Code, the Defendant was obligated to possess, and promptly produce, a valid form of driving insurance. Section 2118(o) states:
"Insurance identification card" shall mean a card issued by or on behalf of the insurance company...duly authorized to transact business in this State which states in such form as the Insurance Commissioner may prescribe or approve that such company has issued a vehicle insurance policy meeting the requirements of [Title 21]. If the insured and insurance company both consent, the insurance identification card may be produced in electronic format. Acceptable electronic formats include *display of electronic images on a cellular phone* or any other type of portable electronic device (emphasis added)).

[66] Albeit not the extreme nervousness represented by Tfc. Holl in testimony.

[67] Our facts are further distinguishable from *Caldwell*, where the defendant in that case, upon exiting his vehicle, was immediately frisked and handcuffed. Here, Defendant was not handcuffed.

appears to the Court that the State has met its burden of showing that Tfc. Holl did not initially exceed the scope of the stop, because his actions were made in furtherance of completing the traffic stop, to which Defendant caused his own delay.

> *ii. Tfc. Holl did not sufficiently develop a reasonable, articulable suspicion to extend the stop a second time because of the belief that Defendant possessed drugs and drug paraphernalia.*

While the Court found Tfc. Holl had reasonable, articulable suspicion to initially extend the traffic stop, the Court questions Tfc. Holl's credibility regarding his representations presented through testimony that he claims established reasonable, articulable suspicion to further extend the traffic stop. As a result, the Court finds Tfc. Holl's testimony on these points not credible, and thus, he did not establish reasonable, articulable suspicion that Defendant possessed drugs and drug paraphernalia.

Reasonable, articulable suspicion, as previously stated above, is defined as a detaining officer, under the totality of the circumstances, demonstrating a "particularized and objective basis for suspecting the particular person stopped of criminal activity."[68] A driver's nervous behavior and/or strange assertions that he did not know the name of his passenger *may or may not* provide a law enforcement officer with reasonable, articulable suspicion justifying further limited questioning of the suspect and/or his passenger.[69] But if more "tangible, objectively articulable

---

[68] *See* Supra n.53-54.

[69] *Caldwell*, 780 A.2d at 1050 (emphasis added).

16

indicators of criminality are present, such as driving with a suspended license, failure to provide proof of ownership of the vehicle, or the palpable odor of alcohol, drugs, or air freshener (often used to mask the smell of marijuana and cocaine)," that indicator(s), in conjunction with nervousness, may provide stronger support for a finding of reasonable, articulable suspicion of criminal activity.[70]

Defendant argues that the blade/nail file observed by Tfc. Holl was simply a nail file and that taken alone the item cannot be considered drug paraphernalia pursuant to 16 *Del. C.* § 4772.[71] Tfc. Holl testified however, that he observed brown

---

[70] *Huntley*, 777 A.2d at 256; *see also United States v. Hunnicutt*, 135 F.3d 1345, 1350 (10th Cir. 1998) (suspended license, no insurance nor proof of authority to use car, nervous behavior and inconsistent responses); *Fields v. State*, Tex.App., 932 S.W.2d 97, 105 (1996) (inconsistent stories, extreme nervousness, suspended license, and passenger's denial of history of drug offenses); *United States v. Palomino* 100 F.3d 446, 450 (6th Cir. 1996) (inconsistent stories about the ownership of the car and the purpose of the trip, nervousness, driver's criminal record, and the odor of chemicals associated with cocaine); *United States v. Hernandez*, 872 F.Supp. 1288, 1294 (D. Del. 1994) (air freshener, nervousness, inability to answer routine questions about line-of-business and car owner); *United States v. Shabazz*, 993 F.2d 431, 433 (5th Cir. 1993) (false identification and inconsistent stories); *United States v. Turner*, 928 F.2d 956, 959 (10th Cir. 1991) (nervousness and no registration); *United States v. Cummins*, 8th Cir., 920 F.2d 498, 502 (8th Cir. 1990) (counter-surveillance driving to avoid police, nervous and evasive behavior, and inconsistent answers).

[71] *See* 16 *Del. C.* § 4772. The section 4772 factors are: (1) statements by an owner or by anyone in control of the object, concerning its use; (2) the proximity of the object, in time and space, to a direct violation of this chapter; (3) the proximity of the object to controlled substances; (4) the existence of any residue of a controlled substance on the object; (5) direct or circumstantial evidence of the intent of an owner, or of anyone in control of the object, to deliver it to persons whom the owner knows, or should reasonably know, intend to use the object to facilitate a violation of this chapter. The innocence of an owner, or of anyone in control of the object, as to a direct violation of this chapter shall not prevent a finding that the object is intended for use, or designed for use, as drug paraphernalia; (6) instructions (oral or written) provided with the object, concerning its use; (7)

17

residue on the blade/nail file, and that based on his experience and training, he believed the residue was heroin.[72]

Heroin residue on the blade/nail file would clearly invoke factor four (4) pursuant to section 4772, and, combined with Defendant's alleged conduct, might establish reasonable, articulable suspicion that criminal activity was afoot. Indeed, if the Court chose to take Tfc. Holl's testimony blindly at face value, the Court could deny the Defendant's motion.

In this case, however, and after consideration of Tfc. Holl's testimony and comparing it to the MVR footage, the Court is not satisfied that his testimony was credible as it finds portions of Tfc. Holl's testimony regarding the traffic stop to directly conflict with the MVR recording. Additionally, the Court is also deeply disturbed by certain statements made by Tfc. Holl during the traffic stop that further makes the Court question his credibility regarding the alleged presence of drug paraphernalia he allegedly observed in plain view. As a preliminary matter, two points need to be addressed: (1) the lack of immediate testimony regarding Tfc. Holl's observance of heroin residue; and (2) the knife taken from the Defendant during the

---

descriptive materials accompanying the object which explain or depict its use; (8) national and local advertising concerning its use; (9) the manner in which the object is displayed for sale; (10) whether or not the owner, or anyone in control of the object, is a legitimate supplier of like or related items to the community, such as a licensed distributor or dealer of tobacco products; (11) direct or circumstantial evidence of the ratio of sales of the suspect object to the total sales of the business enterprise; (12) the existence and scope of legitimate uses for the object in the community; and (13) expert testimony concerning its use.

[72] TR at 30:16-20.

pat down search.

The Court first notes that Tfc. Holl failed to reference any heroin residue during his testimony on direct examination. The State argues that whether he testified to heroin residue on direct or redirect examination, Tfc. Holl still offered sworn testimony to that affect. On that point, the Court agrees with the State.

However, the presence of the alleged heroin residue on the blade/nail file is dispositive to the State's argument that Tfc. Holl developed reasonable, articulable suspicion to extend the traffic stop a second time. Keeping that in mind, the Court finds it curious this dispositive fact was not referenced during Tfc. Holl's testimony on direct examination, especially when the State questioned him about his observations regarding the blade/nail file. Tfc. Holl stated: "[a]s I stood on the passenger side of the car, I saw to me what was a small metal blade that is commonly used for heroin use."[73] There was no mention of heroin residue, however, until Tfc. Holl was prompted by the State's question on re-direct examination. The Court, as the finder of fact, questions Tfc. Holl's failure to reference the presence of heroin residue when he was describing the blade/nail file (referred to as a blade in testimony) in detail, during direct examination,[74] especially when, as here, the heroin residue is the foundation for his alleged and additional reasonable, articulable suspicion that

---

[73] TR at 10:10-12.

[74] *See Id.* at 10:15-16 ("[The blade/nail file] was approximately an inch in length, maybe a quarter inch wide.").

"criminal activity was foot."[75]

Second, the State appeared to argue that Defendant's possession of a knife should be calculated into the Court's analysis. In this instance, the Court has so considered it, but disagrees that the knife adds further weight to its reasonable, articulable suspicion analysis. Despite the record clearly showing Defendant disclosed to Tfc. Holl that he had a "knife,"[76] the record is void of any sufficient articulation as to whether the seized knife was a "deadly weapon" pursuant to 11 *Del. C. § 222* or an "ordinary pocket knife."[77] While it is true that knives, under certain circumstances, may be classified as deadly weapons, knives that are ordinary pocket knives are excluded from that definition.[78] Here, the Court will not, nor cannot, presume, without evidence or testimony to the contrary, that Defendant was carrying a knife classified as a deadly weapon. Neither the State nor Tfc. Holl has represented the knife as a "deadly weapon" that should be considered in a reasonable, articulable suspicion analysis. Thus, the Court declines the State's invitation to consider the

---

[75] *Id.* at 10:04.

[76] St. Ex. 1 at 01:03:42-45.

[77] *See* 11 *Del. C. § 222(5)* (emphasis added); *see also McIntosh v. State*, 655 A.2d 308, 1995 WL 48386, at *1 (Del. 1995) (Table) (quoting section 222 as codified by 68 Laws 1992, ch. 378 *§§* 1-3, eff. July 14, 1992). The Court notes, however, that the cited language regarding knives appears to be unchanged since *McIntosh* was decided in 1995.

[78] 11 *Del. C. § 222(5)* (The definition of a "deadly weapon" includes "a knife of any sort (other than an ordinary pocket knife carried in the closed position)."An "ordinary pocket knife" is defined as "a folding knife having a blade not more than three inches in length.").

*State v. Matthew D. Frost*
Case No. 1810006157
May 28, 2019

knife in its analysis, which would, in the Court's view, presume the knife was a deadly weapon.

Returning to the issue of Tfc. Holl's credibility, or lack thereof, the Court finds portions of his testimony regarding Defendant's conduct were at best exaggerations and possibly misrepresentations.

First, as previously stated, Tfc. Holl testified that Defendant was "extremely nervous," more nervous than the average motorist.[79] In support, he illustrated several observations he made regarding the conduct.[80] However, upon viewing the MVR footage, the footage does not appear to confirm or discount Tfc. Holl's representation regarding Defendant's hands. However, the Court does consider Tfc. Holl's testimony that Defendant moved frantically with his hands *before* he told Tfc. Holl that he did not have proof of insurance available[81] and "when [Defendant] was frantically moving[,] *just for the insurance card*, he reached into the center console and shut it real quick."[82] Based on Tfc. Holl's testimony, it does not appear that Defendant was trying to hide any contraband, rather, he, as most drivers who are pulled over, exhibited some level of nervous behavior when he could not locate his insurance

---

[79] TR at 7:19-20. *But cf.* St. Ex. 1 (MVR footage shown at both hearings appears to suggest the State's characterization compared to Tfc. Holl's "Richter scale" articulation of certain behaviors exhibited by the Defendant during the traffic stop.).

[80] *See* Supra n.6-11.

[81] TR at 08:4-5.

[82] TR at 09:21-23 (emphasis added).

21

*State v. Matthew D. Frost*
Case No. 1810006157
May 28, 2019

information.

Assuming arguendo that Tfc. Holl's testimony regarding Defendant's extreme nervousness was accurate, the MVR footage would have likely confirmed at least some of Defendant's body movements and other bodily functions, e.g., his voice, that would likely correspond with the alleged frantic behavior. For example, the MVR footage provides clear audio of Defendant's voice and his answers to questions regarding his prior travel and Ashley. After reviewing the MVR footage, it does not appear to the Court that Defendant sounds "extremely nervous" and the visible portions of his body do not reflect movements that correlate to "extreme nervous[ness]." There further appears to be no frantic movements of Defendant's head, such as sudden jerking or quickly moving side-to-side, and his head is visible on the MVR footage throughout the traffic stop while Defendant was sitting in his vehicle.

The Court also disagrees with Tfc. Holl's characterization regarding Defendant's answers relating to "Ashley." In short, Defendant's answers are not "delayed,"[83] "vague,"[84] or further provide sufficient basis to believe that he was "making up a story."[85] On the contrary, Defendant is clearly heard giving prompt, clearly audible, and specific answers to Tfc. Holl's questions, including, without

---

[83] *Id.* at 8:11; 8:22-23; 15:14.

[84] *Id.* at 9:5; 9:17; 16:16.

[85] *Id.* at 9:9-10.

22

hesitation or confusion, that he came from North Smyrna after he gave Ashley a ride home.[86]

However, and damaging to Tfc. Holl's credibility, the Court is somewhat disturbed by statements made by Tfc. Holl during the first extension of the traffic stop. The MVR clearly records Tfc. Holl stating:

"if it is just [blade/nail file], I'm going to chalk it up to Ashley."[87]

And a short time later:

"it's safe to say that it's Ashley's drug paraphernalia."[88]

Tfc. Holl testified multiple times that the Defendant's answers regarding his travel and Ashley were vague and led him to believe that Defendant had made up a story. Nevertheless, Tfc. Holl was willing to assign ownership of the blade/nail file to Ashley, suspected as a heroin user.[89] The Court sees this as a conflict. If Tfc. Holl truly believed, *as he testified*, that Defendant had made up a story, particularly regarding Ashley, how then could he rely on her unconfirmed existence, to "chalk

---

[86] The Court acknowledges the State's contentions regarding Defendant's answers relating to his disability payments and his daughter. However, St. Ex. 1 clearly shows Defendant nearly sandwiched between the officers while they are both questioning him. Specifically regarding his amplification of the disability payments, it appears to the Court that Defendant is attempting to finish an answer, after quickly answering Cpl. Goertz's question regarding his identification photo. *See* St. Ex. 1 at 01:04:09-30.

[87] St. Ex. 1 at 01:05:19.

[88] *Id.* at 01:05:53.

[89] *Id.* at 01:05:08.

23

[the blade/nail file] up to [her]" or say its "safe to say" the drug paraphernalia belonged to her?

It is obvious to the Court, that if no other drugs or drug paraphernalia had been admitted to and/or found, Tfc. Holl intended to blindly clear the Defendant of wrong doing, without evidence confirming Ashley's existence, but possessing *alleged* evidence of *alleged* drug paraphernalia with *alleged* heroin residue located in plain view, mere inches away from Defendant, the *confirmed sole occupant of the vehicle.* The Court declines to reconcile this paradox in Tfc. Holl's testimony and his recorded statements in favor of the State. Here, it is not clear that Tfc. Holl concluded that the blade/nail file was Ashley's or not, or merely used this as a ruse to obtain an admission by Defendant of the presence of illegal contraband.

The Court finds it is difficult to find Tfc. Holl demonstrated reasonable, articulable suspicion, when his credibility and testimony has been called into question. As such, the Court finds that under the totality of the circumstances, Tfc. Holl's testimony is not credible regarding his description of alleged drug paraphernalia in plain view. As a result, the Court finds that Tfc. Holl did not demonstrate reasonable, articulable suspicion to believe that Defendant possessed drugs and drug paraphernalia that would justify extending the traffic stop a second time.

> *iii. Because Tfc. Holl did not sufficiently develop a reasonable, articulable suspicion that the Defendant possessed drugs and/or drug paraphernalia, he did not demonstrate probable cause to conduct a warrantless search on the Defendant's vehicle.*

An individual's right to be free from unlawful governmental searches and seizures in Delaware is secured by two independent sources. The Fourth Amendment of the United States Constitution guarantees "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...."[90] Likewise, Article I, Section 6 of the Delaware Constitution guarantees that "[t]he people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures...."[91] Searches and seizures are presumptively unreasonable unless authorized by warrants or a recognized exception to the warrant requirement.[92]

The exclusionary rule is the recognized remedy in cases where a defendant's right to be free from illegal searches and seizures has been violated.[93] In those extraordinary instances, evidence recovered illegally must be excluded in the absence of independent sources or situations allowing for inevitable discovery.[94]

Here, the State argues that the Defendant's disclosure of marijuana and other drug paraphernalia is enough to establish probable cause and is analogous to probable

---

[90] U.S. Const. amend. IV.

[91] Del. Const. art. I, § 6.

[92] *Coursey*, 136 A.3d at 322 (citing *Mason v. State*, 534 A.2d 242, 248 (Del. 1987).

[93] *Id.* (citing *Jones v. State*, 745 A.2d 856, 872 (Del. 1999)).

[94] *Id.* (citations omitted).

cause being established by the smell of marijuana emanating from a vehicle.[95] This disclosure alone, the State asserts, is enough for the Court to find probable cause.[96] However, under these limited circumstances particular to this case, the Court disagrees.

The State cites *United States v. McCarty*[97] and *United States v. Derickson*,[98] both federal circuit cases from the Fifth and Eighth Circuits respectably, in support of its argument. In *Derickson*, the Fifth Circuit found that the defendant's "uncontested admission" that his vehicle contained marijuana established probable cause.[99] In *McCarty*, a law enforcement officer stopped the defendant for speeding and while waiting for verification of the defendant's documents, the officer asked if the defendant had any drugs in the car.[100] After becoming visibly nervous, the officer

---

[95] *See State v. Dewitt*, 2017 WL 2209888, at *2 (Del. Super. May 18, 2017) (citing *Fowler v. State*, 148 A.3d 1170 (Table) 2016 WL 5853434 at *2 n. 5 (Del. Sep. 29, 2016) (citing *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006)); *see also United States v. Simmons*, 2007 WL 3122169, at *3 (3d Cir. 2007) ("The odor of 'marijuana alone, if articulable and particularized, may establish ... probable cause for officers to believe that contraband is present in the area from which the scent emanates.'").

[96] *See United States v. Harris*, 403 U.S. 573, 583 (1971) ("Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility-sufficient at least to support a finding of probable cause to search.").

[97] 612 F.3d 1020 (8th Cir. 2010).

[98] 136 F.3d 136, 1998 WL 30007, at *1 (5th Cir. 1998).

[99] *Derickson*, 1998 WL 30007, at *1.

[100] *McCarty*, 612 F.3d at 1023.

encouraged the defendant to honestly disclose what was in the vehicle.[101] Subsequently, the defendant admitted that marijuana was in the center console, which led to a warrantless search of the vehicle that yielded a significant quantity of contraband.[102] The Eighth Circuit found that the defendant's admission established probable cause to search for only the marijuana, and that discovery in turn, established probable cause to search the entire vehicle.[103]

The Court distinguishes Defendant's case from *McCarty*.[104] In this case, while Defendant did disclose marijuana and drug paraphernalia was in the vehicle, he did so *only after* Tfc. Holl's first statement and intention to blame Ashley for possession of the alleged drug paraphernalia. In *McCarty*, the officer graduated his response to circumstances and employed the least intrusive means to verify or dispel his suspicions by asking the defendant to be truthful about the presence of drugs in the car.[105] Here, Tfc. Holl was willing to assign blame to an individual he had not confirmed existed, providing certain conditions existed and those actions are

---

[101] *Id.*

[102] *Id.*

[103] *Id.* at 1026 (citing *United States v. Hernandez–Mendoza*, 600 F.3d 971, 976 (8th Cir. 2010); *United States v. Olivera–Mendez*, 484 F.3d 505, 512 (8th Cir. 2007)).

[104] The Court notes *Derickson* is a sparsely written opinion with little to no facts to offer comparison to the present case. As such, the Court finds it unpersuasive. *McCarty*, on the other hand, is a much more informative illustration and comparison to Defendant's case.

[105] *McCarty*, 612 F.3d at 1025.

distinguishable from *McCarty*.

Accordingly, and for the same reasons mentioned above regarding reasonable, articulable suspicion, the Court finds the warrantless search of the Defendant's vehicle was unsupported by the required probable cause.

## C. Inevitable Discovery

At the suppression hearing, the State appeared to argue, through Tfc. Holl's testimony, and for the first time, that even if the Court found the evidence was seized unlawfully, it should be admitted nevertheless pursuant to the inevitable discovery doctrine because the evidence would have been discovered as a result of an inventory search. The Court disagrees and finds inevitable discovery does not apply to the particular facts of this case.

It is well settled that Delaware has adopted the inevitable discovery doctrine.[106] Inevitable discovery provides that evidence obtained unlawfully will be admissible if the State can *prove that evidence would have been discovered, in spite of the illegal police conduct.*[107] In so doing, our courts may rely upon testimony on normal procedure and "what inventory searches are usually done" in order to invoke inevitable discovery.[108]

---

[106] *Martin v. State*, 433 A.2d 1025, 1031 (Del. 1981) (citing *Cook v. State*, 374 A.2d 264 (Del. 1977).

[107] *State v. Brownell*, 2005 WL 268043, at *1 (Del. Super. Jan. 28, 2005) (citing *Hardin v. State*, 844 A.2d 982, 987 (Del. 2004) (emphasis added)).

[108] *Lambert v. State*, 149 A.3d 227, 2016 WL 5874837, at *1 n.3 (Del. 2017) (Table).

Discoveries such as those, are sometimes made pursuant to a well-defined exception to the Fourth Amendment's warrant requirement called an inventory search.[109] This Court has held that inventory searches are lawful when they are "made to safeguard property for the benefit of the owner, police and tow company, and not under pretext to gather evidence without a warrant."[110]

An inventory search may be conducted to accomplish one or more of three purposes: (1) to protect the owner from theft or damage while the vehicle is under police control; (2) to protect police from false claims; and (3) to protect police from danger.[111] Under conditions where an inventory search is actually conducted, the State has the burden to show that the inventory search was conducted in good faith "in furtherance of the police care taking function and not as a pretext for an investigatory motive."[112]

At the suppression hearing, the State presented Tfc. Holl with a hypothetical situation on regarding standard operating procedures that would have occurred *if* Defendant had been unable to produce his insurance information.

Q: And if you don't have insurance in Delaware, can you drive?

A: No.

---

[109] *State v. Deputy*, 2001 WL 1729120, at *2 (Del. Super.) (citing *Colorado v. Bertine*, 479 U.S. 367, 371 (1987)).

[110] *Brownell*, 2001 WL 1729120, at *1 (citing *Lively v. State*, 427 A.2d 882, 883 (Del. 1981)).

[111] *Deputy*, 2001 WL 1729120, at *2 (citing *Bertine*, 479 U.S. at 372).

[112] *State v. Miller*, 420 A.2d 181, 184 (Del. Super. 1980).

> Q: So, *if* the [D]efendant was unable to produce insurance, would he have be able to drive [the car] away?
>
> A: No.
>
> Q: What would [Tfc. Holl] have done with the car?
>
> A: Towed it.
>
> Q: Would you have done anything before you towed it?
>
> A: Conducted an inventory search.[113]

As illustrated above, *if, and only if*, Defendant was unable to produce his insurance information (and no drugs and drug paraphernalia had been found) then: (1) he would not have been permitted the drive the vehicle; (2) the vehicle would have been towed; and (3) an inventory search would have been conducted before the vehicle was towed. However, there was no evidence presented that the Court can rely upon that shows that Defendant would not have been able to produce insurance information, given an additional opportunity, especially since he was lawfully trying to access it via the GEICO app before he was asked to exit the car.

The State cites *Martin v. State*[114] in support of its position that inevitable discovery applies and contends the Delaware Supreme Court relied on minimal testimony about a hypothetical situation that the State contends was similar to Tfc. Holl's testimony. The Court disagrees with the State's representation of *Martin*.

---

[113] TR at 31:7-18 (emphasis added).

[114] 433 A.2d 1025 (Del. 1981).

In *Martin*, our Supreme Court did not solely rely on minimal testimony regarding a hypothetical search warrant that might have occurred as the result of probable cause to search a vehicle. The *Martin* court also relied on the fact that the officers involved undertook a "saturation investigation" where they: (1) sought and were granted other warrants related to the case in other states; (2) provided sufficient basis for those warrants; and (3) determined that consent from one of the witnesses to search a hotel room, would have been granted if asked for by the police.[115]

Here, and while not directly on point, the Court finds *State v. Brownell*[116] to be instructive. In *Brownell*, law enforcement responded to a car accident and discovered the defendant under the influence.[117] Due to the defendant's condition, the officer conducted a limited search of the defendant's vehicle in an attempt to find his license, registration, and proof of insurance.[118] During that limited search, the officer discovered, removed, and opened a canister that contained marijuana.[119] The vehicle was subsequently towed and an inventory search was conducted.[120] Upon the defendant's motion to suppress, the State conceded that the initial seizure of and

---

[115] *Martin*, 433 A.2d at 1031-32.

[116] 2005 WL 268043 (Del. Super. Jan. 28, 2005).

[117] *Brownell*, 2005 WL 268043 at *1.

[118] *Id.*

[119] *Id.*

[120] *Brownell*, 2005 WL 268043 at *1.

31

opening of the cannister was improper,[121] but nevertheless argued inevitable discovery.[122] This Court agreed with the State, but further stated:

> ...instead of establishing some minimum threshold or knowledge base of the officer regarding police procedures for an inventory search or even taking the time to set forth on the record what occurred in this particular case, the State simply asked the officer if he followed standard operating procedures to which he answered "yes." There was no testimony as to his knowledge of those procedures, no testimony as to what those procedures may entail, or even if the process is one the officer was trained on during his time in the police academy.[123]

This Court further stated:

> Having no independent basis to find support for an appropriately conducted inventory search, the Court is left simply to rely upon the officer that he did it right. In essence, the State has asked the Court to fill in the blanks using the Court's knowledge of an inventory search which simply is not permissible. The burden here is upon the State and not the Court. This is particularly troublesome since the Court finds the credibility of the police officer here was suspect based upon the previous seizure of the container, his knowledge of its

---

[121] *Id.*

[122] *Id.*

[123] *Id.*

contents and his belief that searching for contraband was a legitimate purpose of inventory searches.[124]

As a result, this Court found that the State failed to establish a sufficient record of the inventory search and, thus, failed to meet its burden of establishing that the seizure was lawful.[125]

In this case, and notably absent as was the case in *Brownell*, was testimony from Tfc. Holl as to his actual knowledge of the standard inventory search procedures, testimony as to what those inventory search procedures may entail, or testimony that he was properly trained to conduct such inventory searches. He simply stated that an inventory search would have been conducted *if* the Defendant had not been able to produce his insurance information.[126] The Court in *Brownell*, as in the present case, also determined that the officer's credibility was in question. Furthermore, and, unlike *Brownell*, neither Tfc. Holl, nor Cpl. Goertz, made any further attempts to allow Defendant to pull up his proof of insurance information on his phone once he exited his vehicle.

Tfc. Holl's testimony regarding a hypothetical inventory search leaves the Court with only one option, to conjecture that Defendant would been unable to

---

[124] *Brownell*, 2005 WL 268043 at *2.

[125] *Id.*

[126] *See* Supra n.113.

33

provide proof of insurance, given further opportunity,[127] and that an inventory search would have been conducted by a qualified police officer. The Court declines to offer such conjecture.

Under these circumstances, Defendant was not given ample opportunity to further produce his proof of insurance. As a result, the Court finds that there is no way for Tfc. Holl to determine whether (1) Defendant would have been unable to produce his insurance information during the duration of the traffic stop and (2) whether the vehicle would have been ultimately towed by law enforcement as a result of Defendant being unable to produce valid insurance information. Accordingly, the Court does not agree with the State that the seized evidence would have been inevitably discovered pursuant to an inventory search. As a result, the Court rejects the State's inevitable discovery argument, and finds inevitable discovery, under these facts, does not apply to the present case.[128]

## D. The Defendant's Motion to Reopen Evidence

Based on the Court's decision regarding the issues discussed above, it appears to the Court that Defendant's motion to reopen evidence is now moot.

---

[127] St. Ex. 1 at 01:12:57 (Defendant's phone had been left in the vehicle and he asks Tfc. Holl to retrieve it.).

[128] The Court further finds that the State has failed to provide an independent basis to find support for an appropriately conducted inventory search because it failed to demonstrate reasonable, articulable suspicion for Tfc. Holl to extend the Defendant's traffic stop for a second time and probable cause to search the vehicle.

## CONCLUSION

Therefore, based on the above stated reasons, the Defendant's Motion to Suppress is **GRANTED**. All evidence obtained is ordered to be suppressed as fruit of the poisonous tree.[129] The Defendant's Motion to Reopen Evidence is **DENIED** as moot.

IT IS SO ORDERED.

Hon. William L. Witham, Jr.
Resident Judge

WLW/dmh

oc:  Prothonotary
cc:  Lindsay A. Taylor, Esquire
     Stephanie H. Blaisdell, Esquire

---

[129] *See generally Wong Sun v. United States*, 371 U.S. 471 (1963).